No. 14,563.

PEOPLE EX REL. COLORADO STATE HOSPITAL ET AL.
*v.* ARMSTRONG, STATE TREASURER.

No. 14,564.

PEOPLE EX REL. FAIRALL ET AL. *v.* BEDFORD, STATE
AUDITOR ET AL.

(90 P. [2d] 522)

Decided April 27, 1939.

Mr. Byron G. Rogers, Attorney General, Mr. Henry E. Lutz, Assistant, Mr. Charles Rosenbaum, Mr. Jean S. Breitenstein of counsel, for petitioners.

Mr. Elmer P. Cogburn, Mr. George A. Crowder, Mr. Walter W. Blood, for respondents.

Mr. R. Hickman Walker, amicus curiae.

*En Banc.*

Mr. Justice Knous delivered the opinion of the court.

SEPARATE applications for alternative writs of mandamus directed against Charles M. Armstrong, as state treasurer in case No. 14,563, and in case No. 14,564 against Armstrong as state treasurer and Homer F. Bedford as state auditor, were filed April 10, 1939, by the respective petitioners, invoking original jurisdiction of this court and praying that the respondents in their respective official capacities be required to issue and pay certain warrants hereinafter mentioned or show cause. As will be obvious from a perusal of the recital of the facts to follow, the controversy involves public matters of the greatest gravity and importance to the people and government of the state. In the light of these impelling circumstances and to the end that the determination of the questions presented might be expedited, in the exercise of our original jurisdiction we caused the alternative writs to issue. In response thereto on April 12, respondents filed separate demurrers to the petitions. The cases were consolidated for argument, argued on April 13, and all parties agreed that disposition of the demurrers will amount to a conclusive determination of the issues involved without necessity for further pleading or proceedings. Since the resolution of certain basic questions, common to both proceedings, primarily relating to the validity and effect of House Bill No. 122 of the Thirty-second General Assembly are decisive of the major issues, we shall discuss and dispose of both causes in one opinion. For convenience such incidental matters as are not common to both cases also will be specifically mentioned in this opinion.

The petitions allege, and the demurrers admit, that the revenue specifically allocated to the general fund of the state for the payment of first and second class appropriations of the Thirty-first General Assembly, under the classification provided by section 16, chapter 153, '35 C. S. A., will be sufficient to pay in full all first class appropriations by the close of the fiscal period ending June 30, 1939, for which they were made, but that because

of a partial failure of the forms of taxation and sources of revenue so allocated to the general fund to produce the amount of money anticipated by the Thirty-first General Assembly in making such appropriations, it has developed that appropriations of the second class for said fiscal period, to the estimated amount of $1,685,000, in all likelihood could not be paid in full unless previous to the expiration of said fiscal period the general fund was augmented by additional revenue or resources. Petitioners in both cases assert that the appropriations to them or in which they are interested are of the statutory second class, although as to the State Board of Public Welfare, petitioners in case No. 14,564, this is questioned by respondents. It is conceded, however, that all second class appropriations for the fiscal period ending June 30, 1939, are in the same general situation. To meet this emergent contingency the Thirty-second General Assembly, which met and convened on January 4, 1939, passed House Bill No. 122, the subject of this controversy. The bill was signed by the Governor on March 31, 1939, and by its terms, effective from and after that date, purported to allocate a specified percentage of certain proceeds of the state income tax for the years 1938, 1939 and 1940, to the "Reserve for General Fund of the State" for transfer to the general fund by the machinery therein provided, for the payment of first and second class appropriations of the Thirty-first General Assembly for the fiscal period expiring June 30, 1939, and for the payment of appropriations of the Thirty-second General Assembly for the biennium expiring June 30, 1941, when this allocation is expressly terminated. In accordance with the provisions of said House Bill No. 122 the Governor on April 8, 1939, executed his voucher and approved for payment expenditures in the sum of $390,000 out of the "Reserve for General Fund of the State" and directed that said sum be transferred to the general fund for the payment of first and second class appropriations of the Thirty-first General Assembly. The treasurer, however, refused to draw

the warrant for said transfer, and the treasurer and auditor further refused to draw the specific warrants with which the petitioners are concerned on the general fund, as a result of which these proceedings were instituted.

The income tax law of 1937, chapter 175, S. L. 1937, chapter 84A '37 Supp., '35 C. S. A., was enacted by the Thirty-first General Assembly at its 1937 regular session under the authority conferred by section 17, article X of the Constitution, adopted by vote of the people in the general election in 1936. By the express provisions of that constitutional amendment the general assembly was empowered to levy an income tax ''for the support of the state, or any political subdivision thereof, or for public schools.'' The 1937 income tax act, operative as of July 1, 1937, allocated the proceeds from the income tax to a fund known as ''Reserve for General County School Funds,'' and provided that upon compliance with certain conditions designed to effect a reduction of property taxes, such avails should be distributed to the treasurers of the respective counties of the state to the credit of certain school funds in the various school districts of the counties with the proviso that in any county wherein the population exceeded 250,000, the funds appropriated might be distributed fifty per cent to the school district or districts therein and the balance to the county or city and county. The proceeds of the 1937 tax available on October 15, 1938, were distributed in accordance with the last mentioned provision and the questions here involved relate primarily to the subsequent taxes covered by House Bill No. 122.

The constitutionality of the income tax law of 1937, supra, is not challenged. We, therefore, assume its validity. Nor do we concern ourselves with the validity of House Bill No. 122 beyond the specific questions raised by the demurrers of the respondents. In the consideration of these questions the fundamental principles of construction require ''those who seek to overthrow a statute, on account of its repugnance to a constitutional pro-

vision, to show the unconstitutionality of the act beyond all reasonable doubt.'' *City of Denver. v. Knowles, .*17 Colo. 204, 30 Pac. 1041. See, also, *People v. Richmond,* 16 Colo. 274, 26 Pac. 929, and *People v. Hinderlider,* 98 Colo. 505, 57 P. (2d) 894.

As being common to both cases the respondents assert first, that since expenditures authorized by the Thirty-first General Assembly for statutory first and second class appropriations for the fiscal year ending June 30, 1939, are certainly estimated to be in excess of the revenue provided by that General Assembly for their payment, under the provisions of sections 2 and 16, article X of the Constitution, such excess appropriations are void. As corollary to this objection it further is urged that under section 16, article X of the Constitution the Thirty-second General Assembly is prohibited from providing revenue for the payment of excess appropriations of the Thirty-first General Assembly. Said section 2, article X, provides: ''The general assembly shall provide by law for an annual tax sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year.'' So far as pertinent, section 16 specifies: ''No appropriation shall be made, nor any expenditure authorized by the general assembly, whereby the expenditure of the state, during any fiscal year, shall exceed the total tax then provided for by law and applicable for such appropriation or expenditure, unless the general assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rates allowed in section eleven of this article, to pay such appropriation or expediture within such fiscal year.''

■ It is established by the decisions of this court, considering the above sections of the Constitution, that when the entire revenue of a given fiscal year has been exhausted, the legislative appropriations for that year remaining unpaid, or any unpaid portions thereof, are totally void, constitute no debt and impose no obligation, legal or moral, upon the people or upon any future gen-

eral assembly. *In re Appropriations,* 13 Colo. 316, 22 Pac. 464; *People v. May,* 9 Colo. 80, 10 Pac. 641; *Parks v. Commissioners,* 22 Colo. 86, 43 Pac. 542.

 It is equally certain, as the authorities recognize, that this void status, however, may not be declared until the total revenues for the fiscal year involved properly shall have been applied to payment of said appropriations, and only after this process is entirely complete do any of such appropriations or any portion thereof become finally void. Therefore, no matter how dire the estimate or dark the forecast as to revenue for any fiscal year, no appropriation for that period can be declared void for deficiency of revenue previous to the expiration of that fiscal year. Under the statute, section 1, chapter 98, S. L. 1929, section 1, chapter 153, '35 C. S. A., the fiscal year involved in the proceeding before us does not expire until June 30, 1939, and, hence, by no process, and even if no attempt had been made to augment the general fund as was the avowed purpose of House Bill No. 122, no appropriation of the Thirty-first General Assembly could be declared void for failure of anticipated revenue until subsequent to June 30, 1939. The unquestioned purpose of section 16, article X, supra, as its terms proclaim and the authorities hold, is to prohibit the making of appropriations authorizing expenditures for any fiscal year in excess of the revenue provided for the payment thereof during said period, to the end that indebtedness beyond the current means of discharging the same may be precluded. *In re Appropriations, supra; People v. May, supra; Johnson v. McDonald,* 97 Colo. 324, 49 P. (2d) 1017. We are of the opinion that it clearly was the intention of the people in adopting this constitutional provision that the inhibition should apply to the fiscal year and not to the general assembly which may chance to be in session at that time. Section 1, article X of the Constitution provides: "The fiscal year shall commence on the first day of October in each year, unless otherwise provided by law." Availing itself of the right thus con-

ferred, upon several occasions the general assembly has designated different periods as the fiscal year for the state, the last pronouncement having been made in 1929, when the present fiscal year, beginning July 1 and expiring June 30, was established. S. L. 1929, c. 98, §1. The latitude accorded the legislature in this respect being, as it is, entirely unrelated to the constitutionally fixed terms for which its members are elected, is inconsistent with any fundamental intent to distinguish between, or restrict the powers of, different general assemblies in fiscal matters by the circumstance that the permissible arrangement of the fiscal year might allow the sessions of separate general assemblies therein. It would therefore appear, that within the *same fiscal year* the power of the Thirty-first and Thirty-second General Assemblies, with relation to providing revenue within constitutional bounds for appropriations of that fiscal year, would be coextensive.

In this connection and to some extent interwoven with the last matters discussed, respondents point out that section 16, article X, supra, not only prohibits the legislature from making excess appropriations, but also forbids officials of the executive department of state, particularly the auditor and treasurer, from paying or authorizing the payment of any appropriations for a given fiscal year except out of monies which in reality constitute revenue of the same fiscal year and are available for that use. *In re Appropriations, supra; Henderson v. People,* 17 Colo. 587, 31 Pac. 334; *Goodykoontz v. People,* 20 Colo. 374, 38 Pac. 473. In view of the responsibility so imposed upon them, for infraction of which they and their bondsmen would be personally liable, respondents express the apprehension that only so much of the 1938 income taxes as are actually collected and received prior to July 1, 1939, constitute revenue of the current fiscal year and that no more than such amount in any event could be applied to the payment of appropriations for that fiscal period, and they refuse to disburse these funds on the

authority of House Bill No. 122 until this question is determined.

 ·Section 28, chapter 142, '35 C. S. A., reads in part as follows: "On and after July 1, 1929, all taxes, receipts, and revenues of the state shall be deemed levied and available for the fiscal year within which they become due and payable; provided, however, that the general property tax on all the taxable property of the state shall be deemed levied for, and. applicable to, the fiscal year which. commences on the July first preceding the January first on. which, pursuant to section 140 of this chapter, the county assessor is required to deliver to the county treasurer the tax list and warrant." Since its proviso clearly relates exclusively to property taxes, the section prescribes that all other taxes and revenues of the state shall be deemed levied and available for the fiscal year in which they become due and payable. The solution of the question under consideration, therefore, rests upon the determination of when the 1938 income tax becomes "due and payable." If it becomes "due and payable" within the fiscal year the proceeds are, and continue to be, revenue of that fiscal year, even though actually paid after its expiration.

Section 1 of the income tax law of 1937, supra, provides, inter alia: "The words 'taxable year' mean the calendar year or the fiscal year ending during such calendar year, upon the basis of which the net income is computed under the provisions of this act."

Section 24 (a) of the act is in part as follows: "All taxes imposed under the provisions of this act shall be paid on the fifteenth day of the fourth month following the close of the taxable year. Provided, that any taxpayer may elect to pay the tax in four equal installments, in which case the first installment shall be paid on the date prescribed for the payment of the tax by the taxpayer, the second installment shall be paid on the fifteenth day of the third month, the third installment on the fifteenth day of the sixth month, and the fourth installment

on the fifteenth day of the eighth month, after such date. If any installment is not paid on or before the date fixed for its payment, the whole amount of the tax unpaid shall be paid upon notice and demand from the state treasurer.'' The respondents argue that if a taxpayer concludes to take advantage of this proviso and does so, the installments which he pays after June 30th, the end of the current fiscal year, do not constitute revenue of said current fiscal year, but of the ensuing fiscal year. Definitely, we are of the opinion that the option given the taxpayer to pay his income tax in four installments is a mere courtesy or privilege extended to him, and the date upon which the income tax becomes due and payable, fixed as the fifteenth day of the fourth month following the close of the taxable year, is not deferred or changed by the conferment of this privilege.

It is, therefore, our conclusion that the entire income tax upon incomes returned for the calendar year ending December 31, 1938, and the entire income tax upon incomes returned for taxpayers' fiscal years so ending that the fifteenth day of the fourth month following the close of such taxpayers' fiscal years would fall on a date prior to June 30, 1939, constitute revenue for the fiscal year ending June 30, 1939, and under the provisions of House Bill No. 122 may be applied to the payment of first and second class appropriations for that period, without reference to whether the actual payment is made upon the due date, by subsequent installments, or otherwise. While it is true that a percentage of the income taxes for the years 1939 and 1940, due respectively in 1940 and 1941 by the provisions of House Bill No. 122, are allocated to the same ''Reserve for General Fund of the State,'' as are percentages of the 1938 tax, it is clear, under the preceding conclusions, that no part of the 1939 or 1940 tax lawfully could be used to meet appropriations for the fiscal year expiring June 30, 1939. Therefore, the circumstance that the proceeds for all these years are allotted to the same fund in no way mitigates against the

validity of the bill, since the disbursing officers of the state properly can apply the revenues of the different fiscal periods to the appropriations therefor as in ordinary cases, as undoubtedly was the intent of the legislature in providing for the additional use of moneys from the mentioned fund to pay appropriations of the Thirty-second General Assembly.

Suggested by the argument is the question of whether, without legislation expressly providing therefor, revenue from the income tax, even though allocated for specific purposes other than to defray the necessary expenses of the executive, legislative and judicial departments of the state government for each fiscal year, under sections 2 and 16, article X of the Constitution, lawfully could be applied to the latter uses in the event of deficiency of revenue therefor to the exclusion of the statutorily allocated purpose, upon the theory of a constitutional preference therefor as discussed *In re Appropriations, supra, Henderson v. People, supra,* and other cases. Likewise mentioned in the argument was the question of whether without, and prior to, the enactment of House Bill No. 122, the income tax revenues which were legally available for the fiscal year ending June 30, 1939, were subject to the classification embodied in the general classification act, section 16, chapter 153, '35 C. S. A.

Conjecture upon these important subjects in the proceeding before us is rendered unnecessary by the fact that the legislature *has* expressly made the income tax revenue, to the extent specified, available to the statutory first and second class appropriations which embrace the expenses of the branches of government above mentioned and of the penal, eleemosynary and charitable institutions of the state, and the petition alleges and the demurrers admit that the actual amount of money thus made available therefor will be in excess of the estimated deficiency.

■■ It next is urged that House Bill No. 122 is unconstitutional, because it attempts to make appropri-

ations for general and special purposes in one legislative act, contrary to the provisions of sections 21 and 32, article V of the Constitution, and in that, as said, it is an attempt to revive and extend appropriations made by the Thirty-first General Assembly, by reference only, and, not setting out such appropriations in detail, it transgresses section 24 of article V of the Constitution. These objections are premised upon the assumption that House Bill No. 122 is an appropriation act within the meaning of the section of the Constitution mentioned. We think this assumption fallacious. In our view, House Bill No. 122 is the exact antithesis of an appropriation bill. The purpose of an appropriation bill is to take money out of the state treasury; the object of House Bill No. 122 is to put money into the state treasury. The argument that the act under consideration is an appropriation measure is largely grounded upon the circumstance that in two places therein the word "appropriate" appears. As demonstrative of legislative intent it may be mentioned that the subtitle of the amended section of the income tax law, which constitutes the body of the new legislation, is: "Allocation of Revenue." In the first instance of its use in the act, the legislature couples the word "appropriate" and the words "set aside" as if they were synonomous. That the word "appropriate" in one of its ordinary proper definitions, means "set aside" or "allocate" is clear. Webster's New International Dictionary, Second Edition; 6 C. J. S., p. 121. When the purpose and object of the bill are considered, the use of the word "appropriate," in the sense indicated, cannot be said to import to the act the classification of an appropriation measure, but rather stamps it as one for the allocation of revenue, which we conclude it is.

In case No. 14,564, relating to the appropriation to the State Board of Public Welfare, as has been noted, respondents question whether such appropriation is of the second class within the purview of section 16, chapter 153, '35 C. S. A. That section is in part as follows:

"Second—Appropriations for all institutions, such as the penitentiary, insane asylum, industrial school and the like, wherein the inmates are confined involuntarily, and appropriations for charitable institutions, shall be next paid." The act of the Thirty-first General Assembly making the appropriation, section 1, chapter 51, S. L. 1937, states that such appropriation shall "be used for the care and relief of destitute unemployed and unemployable citizens of this state and to allay the present widespread distress among the needy citizens in this state." The relief of destitute unemployed and unemployable citizens of Colorado is, by sections 1 and 8, chapter 141, '35 C. S. A., declared a proper state purpose. Expenditures for this purpose are purely charitable in the most fundamental and original sense. The disbursement to the ultimate recipients is grounded upon their need and destitution occasioned by physical incapacity, or by economic conditions preventing employment of the able, and upon no other consideration or terms. If not charitably provided for by the state through its welfare agencies as prescribed by chapter 141, supra, for which the appropriation in question is made, the destitute unemployed and unemployable inevitably and of necessity would have to be cared for in one or more of the established charitable or eleemosynary institutions of the state. Though in a strict sense the words of the statute defining second class appropriations imply a use by institutions, for the reasons stated we have no doubt that they also require this classification for the appropriation in question.

We believe the conclusion we have reached with respect to the major questions raised by the demurrers, in effect, disposes of secondary issues involved, as a consequence of which we perceive that no good purpose would be served by commenting upon the latter.

Accordingly the demurrers in both causes are overruled and, in view of the statement made in open court by respective counsel at the time of oral argument to the

effect that the disposition of the demurrers would be conclusive of the controversies, it is ordered that the alternative writs heretofore issued be made peremptory.

MR. JUSTICE FRANCIS E. BOUCK not participating.