Robert DUXBURY, Roger McKellips, Paul Symens and Linda Lea M. Viken, Petitioners,

v.

Homer HARDING, Treasurer, Vernon Larson, Auditor, and Ron Schreiner, Secretary of Revenue of the State of South Dakota, Respondents.

No. 17952.

Supreme Court of South Dakota.

Argued Aug. 4, 1992.

Decided Sept. 16, 1992.

Michael J. Butler of Butler and Nesson, Sioux Falls, for petitioners.

Mark Barnett, Atty. Gen., Jeffrey P. Hallem and Harold H. Deering, Jr., Asst. Attys. Gen., Pierre, for respondents.

SABERS, Justice.

Petitioners[1] seek a permanent writ of prohibition to prevent Respondents from disbursing or allocating funds pursuant to certain appropriations contained in the 1992 General Appropriation Bill asserting that they were special appropriations requiring a two-thirds vote.

## FACTS

This is a matter of original jurisdiction. S.D. Const. art. V, § 5; SDCL 15–25–1; SDCL 21–30–2. On June 12, 1992, this court granted Petitioners' request for a temporary writ of prohibition. Petitioners challenge the following appropriations because they were part of the General Appropriation Bill which was passed by a simple majority rather than a two-thirds vote in violation of S.D. Const. art. XII, § 2.

1. Property Tax Credit. Section 27, page 36, lines 42 to 46, of the General Appropriation Bill, $6,146,518.00 to be paid to the counties for property tax relief and limited economic development. (HB 1090).

2. DeSmet National Guard Armory. Section 15, page 27, line 20, of the General Appropriation Bill, $76,000.00 of the appropriation for the department of military and veterans affairs to be used to build a national guard armory in DeSmet, Kingsbury County. (SB 171).

3. Presidential Primary Expenses. Section 23, page 35, line 20, of the General Appropriation Bill, $100,000.00 of the "operating expenses" in the office of the secretary of state to be utilized for reimbursement to the counties for the presidential primary. (SB 267).

### History

A review of the history of the following legislation is important to this appeal.

1. *Property Tax Credit—HB 1090*

The Committee on Taxation introduced HB 1090 on behalf of the governor. The bill was entitled "AN ACT TO PROVIDE REAL PROPERTY TAX RELIEF, TO MAKE AN APPROPRIATION THEREFORE AND TO DECLARE AN EMERGENCY."

As originally introduced, HB 1090 created a property tax credit account in the state general fund. Beginning July 1, 1992, 26.75% of the total revenue the state receives as its share from the net video lottery income would be placed in this account. HB 1090 further provided that the money would be distributed to counties to provide a property tax credit to each taxpayer. The bill established a method for distribution in calendar year 1992 and provided that in calendar year 1993, and every year thereafter, each county was to receive an amount equal to the total adjusted property taxes payable in such county multiplied by a factor calculated by the commissioner of finance and management. As originally introduced, HB 1090 contained an emergency clause and a continuing appropriation of revenues to the property tax credit account.

HB 1090 was considered and failed to pass the House of Representatives (House) on three separate occasions. On all three

---

1. Petitioners, State Senators Roger McKellips and Paul Symens and State Representatives Robert Duxbury and Linda Lea M. Viken, are the democratic minority leaders in the Senate and House.

occasions, the Speaker of the House (Speaker) ruled that HB 1090 failed to pass because it did not receive a two-thirds vote of the members.[2] On each occasion, the members of the House agreed by a two-thirds vote to suspend the rules and keep HB 1090 alive for further discussion.

Thereafter, many amendments to HB 1090 were proposed and failed. Eventually, the emergency clause and the continuing appropriation to the department of revenue were deleted.[3] The Speaker ruled that the amended bill, if adopted, could be passed by a simple majority. The decision of the Speaker was appealed to the House by Representative Viken but was sustained. The amendment was then adopted and HB 1090 passed the House with 40 votes in favor, 29 against. When HB 1090 reached the Senate, the bill was amended to allow the counties to "allocate up to twenty percent of the revenue" for economic development. The House concurred in the amendments by a vote of 41 to 27.[4] HB 1090 was signed by the Governor on March 19, 1992. Funding for the property tax credit account was included in the General Appropriation Bill which passed by a simple majority vote of the legislature.

### 2. *DeSmet National Guard Armory—SB 171*

In 1985, the legislature, by special appropriation, authorized the expenditure of $652,500 by the department of military and veterans affairs to provide state matching funds for the construction of national guard armories and additions. Respondents argue that the national guard armory in DeSmet, South Dakota, was one of the projects eligible for construction from that appropriation. A review of the minutes, however, from the Joint Committee on Appropriations reveals that the 1985 expenditure was for construction at Rapid City, Vermillion, Aberdeen, Mitchell and Sioux Falls.

In 1989, the 1985 legislation was amended to extend funding for the construction of certain national guard armories. Respondents argue that part of the funds authorized by the 1989 legislation were "earmarked for the DeSmet project." Nothing, however, in the legislative history supports this argument. The 1985 and 1989 appropriations are important to this appeal for one reason: both measures passed by a two-thirds vote of the legislature. Thus, Respondents argue that because the DeSmet project was approved by two-thirds of the legislature twice before, it was not necessary a third time.

SB 171 was entitled "FOR AN ACT TO APPROPRIATE MONEY FOR THE CONSTRUCTION OF A NATIONAL GUARD ARMORY AT DESMET." Respondents argue that SB 171 was introduced "to secure the $76,000 in additional funding, which when added to the remaining 1985 funding would allow the previously authorized DeSmet project to go forward." However, neither the legislative history nor the act itself supports this argument. SB 171 was tabled on February 18, 1992, and funding was included in the General Appropriation Bill. An attempt was made on the Senate floor to remove this funding from the General Appropriation Bill, but the attempt failed. The funding, as part of the General Appropriation Bill, was passed by a simple majority.

### 3. *Presidential Primary Expenses—SB 267*

The secretary of state is required to reimburse counties for expenses arising from the presidential primary held in February every four years. SDCL 12–6–4.2. In 1988, the legislature passed an emergency

---

**2.** Any act containing an emergency clause requires a vote of two-thirds of all members of each house under art. III, § 22 of the South Dakota Constitution.

**3.** Petitioners argue that while the language "continuously appropriated" was deleted, the rest of the mandatory language was retained and therefore, the bill still required continuing appropriations.

**4.** A special appropriation or emergency measure requires a two-thirds vote of the membership (as opposed to those present). Assuming a vote of two-thirds of all members is required, 47 votes would be needed in the House and 24 in the Senate.

measure which appropriated $250,000 to the counties to reimburse them for expenses of the 1988 presidential primary. *See* Act of March 3, 1988, ch. 131, 1988 S.D. Laws 219 (appropriation to pay for the 1988 presidential primary). In 1989, the legislature passed another emergency measure, appropriating $105,720 for the balance of the expenses incurred in the 1988 primary. *See* Act of March 15, 1989, ch. 128, 1989 S.D. Laws 289 (appropriation to reimburse counties for the 1988 presidential primary). Both passed by two-thirds majority. The 1990 legislature failed to pass a similar appropriation for the anticipated expenses of the 1992 presidential primary.

In 1992, SB 267 was introduced to appropriate $435,000 to the secretary of state to reimburse counties for 1992 presidential primary expenses. SB 267 was entitled, "AN ACT TO MAKE AN APPROPRIATION TO REIMBURSE COUNTIES FOR THE COST OF THE 1992 PRESIDENTIAL PRIMARY AND TO DECLARE AN EMERGENCY."

For some reason, SB 267 was "hoghoused"[5] in the Appropriations Committee and utilized for another subject (AN ACT TO CLARIFY OWNERSHIP OF CERTAIN LAND). On February 27, the contents of SB 267, which had been adjusted to appropriate only $335,000, was inserted into SB 62, which then passed with the requisite two-thirds vote.

The additional $100,000 was placed in the General Appropriation Bill. Respondents argue that the $100,000 appropriation was placed in the General Appropriation Bill "so that the secretary of state could begin to annually acquire the funds necessary to reimburse counties for expenses as required by SDCL 12–6–4.2, beginning after the start of the 1993 fiscal year." (Resp't Br. at 6; *See also* Nicolay aff. Ex. 1 at 3–4). Petitioners assert, however, that there is no legislative history indicating that the legislation had any purpose other than to reimburse the counties for the expenses relating to the 1992 primary.

An attempt to remove this appropriation from the General Appropriation Bill in the Senate failed. The $100,000 appropriation was included in the General Appropriation Bill and passed by a simple majority vote.[6]

### Issue

Whether the inclusion of the disputed appropriations within the General Appropriation Bill violates the South Dakota Constitution.

Petitioners argue that the inclusion of these appropriations within the General Appropriation Bill violates art. XII, §§ 1[7] and 2, and art. XI, § 9[8] of the South Dakota Constitution. While Petitioners argue that all three of these constitutional provisions have been violated, the heart of their argument is based upon S.D. Const. art. XII, § 2 which provides:

The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools. *All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of*

---

5. When a bill is "hoghoused", the substance of the bill is removed, leaving only the "shell" (number), which is then utilized for another subject. This procedure permits the legislature to consider the new bill during the current session.

6. Upon passage, Senators McKellips and Symens filed a dissent disputing the three appropriations. The Governor signed the bill March 19, 1992 and petitioners challenged the three appropriations by bringing this lawsuit.

7. art. XII, § 1:

No money shall be paid out of the treasury except upon appropriation by law and on warrant drawn by the proper officer.

8. art. XI, § 9:

All taxes levied and collected for state purposes shall be paid into the state treasury. No indebtedness shall be incurred or money expended by the state, and no warrant shall be drawn upon the state treasurer except in pursuance of an appropriation for the specific purpose first made. The Legislature shall provide by suitable enactment for carrying this section into effect.

*all the members of each branch of the Legislature.* (Emphasis added.)

Petitioners contend that the appropriations are in reality special appropriations. Petitioners assert that the appropriations do not constitute either "ordinary" or "current" expenses of the state, and therefore, as special appropriations under S.D. Const. art. XII, § 2, must be passed by a two-thirds vote of each branch of the legislature. This court must determine whether the appropriations at issue come within the definition of "ordinary" or "current" expenses of the State.

Petitioners rely upon *State ex rel. Oster v. Jorgenson,* 81 S.D. 447, 136 N.W.2d 870 (1965) which dealt with the General Appropriations Act of 1965, where we stated:

A general appropriation bill is not legislation in the true sense of the term. It is as its language implies "a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning. * * * In providing that it should embrace nothing else, the framers of the Constitution undoubtedly intended that members of the legislature should be free to vote on it knowing that appropriations and nothing else were involved." *Sellers v. Frohmiller,* 42 Ariz. 239, 24 P.2d 666. Its singular subject is the appropriation of money. It serves no other purpose and its contents are constitutionally defined and limited.

*Id.* at 872. The *Jorgenson* court discussed the application of art. XII, § 2 of the South Dakota Constitution and noted that:

This constitutional provision allows a legislative majority to appropriate funds for the ordinary expenses of state government and denies to a minority the power to prevent, obstruct, or stop the operation of the vital affairs of government by denying those necessary funds. *But the door to the state treasury is not so easily opened as to "all other appropriations." They must be the single subject of separate bills and receive the affirmative approval of two-thirds of all members of both houses of the legislature.* Matters which could be included

in the general appropriation bill may be the subjects of special appropriation bills without nullifying consequences. However, appropriations included within the general appropriation bill outside of and beyond its scope are void.

*Id.* at 873 (citing *Callaghan v. Boyce,* 17 Ariz. 433, 153 P. 773 (1915) (emphasis added)). In *Jorgenson* we held:

[T]he term "ordinary expenses of the executive, legislative and judicial departments of the state" [is construed] to mean any related expense which recurs with regularity and certainty. The term "current expenses of state institutions" on the other hand is equivalent to "running expenses" which includes any usual, regular, and continuing expenditure for maintenance of property and for conducting the regular and authorized functions of the institution.... Extraordinary, emergent, and exceptional expenses for any purpose likewise fall within the category of "All other appropriations."

*Id.* at 875. On the basis of this case, if the disputed appropriations were neither "ordinary" nor "current" expenses of the state, then they must be passed by a two-thirds vote of all the members of each house.

■ The burden is on Petitioners to demonstrate that the appropriations were passed in a manner inconsistent with the constitution.

Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakenly shown and there is no reasonable doubt that it violates fundamental constitutional principles.

*Independent Community Bankers Ass'n v. State,* 346 N.W.2d 737, 739 (S.D.1984); *South Dakota Ass'n, Etc. v. State, Etc.,* 280 N.W.2d 662 (S.D.1979).

■ When this court interprets the meaning of a constitutional provision, we must examine the object the framers of the constitution sought to accomplish and the evils they sought to remedy or prevent. *State v. Ostroot,* 75 S.D. 319, 64 N.W.2d 62, 65 (1954); *State v. Wilder,* 73 S.D. 330, 42 N.W.2d 891, 895 (1950); *Schomer v.*

*Scott,* 65 S.D. 353, 274 N.W. 556, 559 (1937); *State v. Reeves,* 44 S.D. 568, 184 N.W. 993, 996 (1921). This court first examined the framers' intent in adopting the two-thirds vote requirement in *In re Limitation of Taxation:*

> This was doubtless regarded by the framers of the constitution as an adequate guaranty against unwise or imprudent use of public funds,—a rule sufficiently flexible to meet emergencies, yet safe and trustworthy, because resting in the conscience and enlightened judgment of so large a proportion of the people's immediate representatives.

3 S.D. 456, 54 N.W. 417, 419 (1893). *Wilder,* 42 N.W.2d at 895. The object of the two-thirds vote requirement was to protect "the taxpayers and the public treasury against hasty and ill-advised outlays for extraordinary expenses[.]" *Id.* With these standards in mind, we examine the disputed appropriations.

### 1. *Property Tax Credit*

Petitioners challenge the property tax credit for two reasons. First, Petitioners argue that HB 1090 is in itself an appropriation which required approval of the legislature by a two-thirds vote. Secondly, Petitioners challenge the establishment of a fund (passed by a simple majority) which mandates future legislatures to fund the program through the General Appropriation Bill, thereby circumventing the two-thirds vote requirement. Respondents admit that HB 1090, as originally introduced, did require a two-thirds vote, but only because it contained a continuing appropriation and an emergency clause. Respondents argue that without those two provisions, HB 1090 is only an ongoing program which should be funded as an ordinary expense.

■ We first turn to Petitioners' argument that HB 1090 is a special appropriation which required approval of the legislature by a two-thirds vote. In *State v. Youngquist,* 69 S.D. 423, 11 N.W.2d 84 (1943) we stated:

> An appropriation [requiring a two-thirds vote] is legislative sanction for the disbursement of the public revenue. *In re Continuing Appropriations,* 18 Colo. 192, 32 P. 272. The test of whether an act is an appropriation is whether the money may be paid or drawn from the state treasury on authority of the act. *Humbert v. Dunn,* 84 Cal. 57, 24 P. 111; *Campbell v. Towner County,* 71 N.D. 616, 3 N.W.2d 822; *People ex rel. Colorado State Hospital v. Armstrong,* 104 Colo. 238, 90 P.2d 522.

*Id.* 11 N.W.2d at 86. HB 1090 clearly states that the revenues for the property tax credit account "shall be appropriated annually through the general appropriation act." Respondents admit that without continuing appropriations it would be impossible to carry out the property tax credit program. Thus, we conclude that while HB 1090 does not contain the words "continuous appropriation," in effect, it created a continuing appropriation which required a two-thirds vote of each house of the legislature.[9]

■ The outcome of Petitioners' second argument depends upon whether the property tax credit is an "ordinary"[10] expense. As we noted earlier, ordinary expenses of the executive, legislative and judicial departments of the state are those related expenses which recur "with *regularity* and *certainty." Jorgenson,* 136 N.W.2d at 875. However, in that case we also stated:

---

9. To determine otherwise is to place form over substance. HB 1090 states:

> "In calendar year 1993 and *each year thereafter,* each county *shall* receive an amount equal to the total property taxes.... In calendar year 1993 and *each year thereafter,* each taxpayer of the county *shall* receive a credit...." And finally, "[e]xpenditures authorized by *this Act* shall be paid on warrants drawn by the state auditor on vouchers ap-

proved by the secretary of revenue." (Emphasis added.)

Applying the test as outlined in Youngquist, because the expenditures "may be paid or drawn from the state treasury on authority of [*this*] act[,]" HB 1090 was an appropriation which failed to receive the requisite vote.

10. There does not appear to be any serious dispute over whether this appropriation was "current." *See Jorgenson,* 136 N.W.2d at 875.

[N]o inflexible rule can be written which will forever clarify and solidify the distinction between *"ordinary,"* "current" and "extraordinary" expenses of state government. The line of demarcation is not clear, distinct, or static. Much must be left to the wisdom, integrity, and good judgment of our legislators.

*Id.* at 875 (emphasis added).

Respondents admit that without the annual appropriation it would be impossible to carry out the tax credit program and acknowledge that there may be years when funds are not available. Applying the foregoing principles, we conclude that the tax credit fund cannot be logically construed to be an ordinary expense of state government. While it is true that as long as there is funding it will recur on a yearly basis, a property tax credit is hardly necessary "in order for the proper operation ... of the state government." *Id.* at 874. It clearly is not an expense of *state* government, ordinary or otherwise, within the meaning of the Constitution.[11]

The wisdom, integrity and judgment of our legislators was exercised when on three occasions HB 1090 failed to pass by a two-thirds vote. Placing the funding in the General Appropriation Bill and calling it an "ongoing program" was simply an attempt to circumvent the constitutional requirement that any special appropriation be passed by two-thirds of the legislature.

### 2. *DeSmet National Guard Armory*

■ As explained earlier, the 1992 funding for the DeSmet National Guard Armory was first introduced as a special appropriation bill. That bill was killed and the appropriation was placed in the General Appropriation Bill by adding the funds to the appropriations for the division of military and veterans affairs.

Respondents argue that because the legislature in 1985 and 1989 appropriated funds by a two-thirds vote for the construc-

tion of national guard armories and additions, a two-thirds vote of the legislature was not necessary to pass this appropriation in 1992. We disagree.

We held in *Jorgenson* that:

Cost of land acquisitions, *erection of permanent buildings* and similar capital expenditures cannot be considered current expenses.

*Jorgenson,* 136 N.W.2d at 875 (emphasis added). Thus, we conclude that this appropriation was not an ordinary expense of state government and therefore, had to be passed by a two-thirds vote of each house of the legislature.

### 3. *Presidential Primary Expenses*

■ Since the presidential primary was established in 1986, presidential primary expenses have been handled through special appropriation bills on an emergency basis. These special appropriations have been passed by the legislature by a two-thirds vote. As we stated in *Jorgenson,* however, "[i]t is of no great significance that a particular appropriation has never been included in a General Appropriation Bill in the past as precedent alone does not prove or disprove the existence of legislative power to do so." *Jorgenson* at 871. Respondents argue that previous presidential primary appropriations were passed by the two-thirds vote solely because of the emergency clause contained within them.

This legislation (SB 267) was originally introduced to reimburse counties for the 1992 presidential primary. It also contained an emergency clause but failed to pass by a two-thirds vote. Later, it was hoghoused into SB 62, which was identical to SB 267 except it appropriated $100,000 less than SB 267. SB 62 passed by two-thirds vote. The General Appropriation Bill was then amended to include $100,000 from the general fund to the secretary of state, to be distributed to the counties as

---

**11.** The property tax credit contemplated by this bill does not provide any *"additional* state aid to our education system," as indicated in the dissent. Rather, this bill simply reduces the property tax burden of individual taxpayers by providing them with a credit, financed with video

lottery income. The counties will receive the same amount of educational funding whether a writ of prohibition is issued or not. While the concept may have some appeal, assisting taxpayers with their county-imposed tax liability is not an ordinary expense of state government.

payment for costs associated with the presidential primary.

Petitioners argue that the same subject (the duty to reimburse counties for the presidential primary) cannot be both a general and a special appropriation. Respondents reply that the legislature decided to address these expenses on an annual basis, commencing in fiscal year 1993, rather than responding on an emergency basis every four years after the expenses have been incurred. As Petitioners note, however, the $100,000.00 allocation was placed into the secretary of state's general operating fund. SDCL 4–8–19 states:

> All unexpended annual appropriations at the end of the fiscal year covered by the general appropriations act which have not been contractually obligated in writing and approved by the commissioner of finance and management prior to the end of the fiscal year, *shall lapse and cease to be available,* and shall revert to the fund from which appropriated. (Emphasis added.)

Therefore, pursuant to SDCL 4–8–19, at the end of fiscal year 1992, the "unexpended" $100,000.00 would revert to the general fund and would not be available to reimburse the state for expenses incurred in future primaries.

Under art. XII, § 2 of the state constitution, the General Appropriation Bill shall only embrace "ordinary expenses" of the three government branches, "current expenses of state institutions, interest on the public debt and for common schools."

SDCL 12–6–4.2 provides:

> The State shall *reimburse* each county for any costs incurred as a result of any presidential primary election held on the last Tuesday in February. (Emphasis added.)

Respondents argue that this statute makes this expenditure a state expenditure. A program intended to reimburse counties for presidential primary expenses, however, does not constitute an "ordinary expense" of any branch of the government. Nor does a county expense become a state expense simply by requiring it to be paid to the counties by the secretary of state. Additionally, this expenditure does not fit within the definition of a "current expense" of a state institution because a county is not a state institution. Therefore, this expenditure comes within the phrase "all other appropriations" which requires a "two-thirds vote of all the members of each branch of the Legislature."

■ In conclusion, the invalidity of these appropriations does not render the entire General Appropriation Bill void or affect the validity or invalidity of the remaining appropriations as the various appropriated funds are severable in nature. *Jorgenson,* 136 N.W.2d at 878.

A permanent writ of prohibition will be issued.

MILLER, C.J., and HENDERSON, J., concur.

WUEST, J., concurs specially.

AMUNDSON, J., concurs in part and dissents in part.

WUEST, Justice (concurring specially).

I do not agree that HB 1090 in effect is a continuing appropriation. To the contrary, it requires an annual appropriation which is not a continuing appropriation. Otherwise, I concur with the majority opinion.

AMUNDSON, Justice (concurring in part and dissenting in part).

I concur with the majority's position on Issues 2 and 3.

The property tax credit legislation was obviously ushered in by the legislature's enactment of the property tax freeze in 1989. *See* SDCL ch. 10–12B. Since this 1989 legislation was repealed as of January 1, 1992, it was obvious that the citizens of this state would be looking at property taxes which could increase close to the boiling point.* This legislation (H.B. 1090) would basically ease the pain of these sky-

---

* This has obviously been the case in certain areas of the state where tax entities have proposed increases ranging from 20% to 70% for 1993.

rocketing taxes on the taxpayers who provide the fuel for the engines of state and local governmental entities.

The majority would erase the relief granted by this legislation to the taxpayers of this state. This court in *State ex rel. Oster v. Jorgensen*, 81 S.D. 447, 456–57, 136 N.W.2d 870, 875 (1965), dealt with an attack on the general appropriation bill passed by the legislature in 1965 and held as follows:

> As the functions of state government cover a wide range of activities involving the public peace, health, safety, and welfare its ordinary expenses cannot fairly be compared or confined to the ordinary expenses of a private business enterprise. They are of a different nature and must change from time to time to meet differing needs and conditions. In other words the unusual and extraordinary may become usual and ordinary. The expanding cost of various health and welfare programs is an example. *Another, is the appropriations which have been regularly made since 1941 to equalize taxation and to relieve distress in counties and school districts having an abundance of nontaxable state owned school and endowment lands within their boundaries.* Therefore, no inflexible rule can be written which will forever clarify and solidify the distinction between "ordinary", "current" and "extraordinary" expenses of state government. The line of demarcation is not clear, distinct, or static. Much must be left to the wisdom, integrity, and good judgment of our legislators. (Emphasis added.)

It is an accurate statement to say that functions of state government change over time in view of the fact that the state budget being considered in *Jorgenson* was in the amount of 62 plus million dollars (General Appropriation Act, ch. 277, 1965 S.D. Laws 382), and the 1992 appropriation bill, which is under consideration in this case, deals with the expenditure of 539 plus million dollars of state funds (General Appropriations Act, ch. 35, 1992 S.D. Laws 57).

House Bill 1090 sends money back to the counties in South Dakota to replace funds that otherwise would have been received from the taxpayers. A taxpayer under this legislation receives a credit against his tax bill from the county. What is the majority of the taxes collected in each county earmarked for? The answer is simple—education. Therefore, the majority of the monies appropriated under this legislation is in essence additional state aid to our education system. Is this an ordinary expense of state government? I dare say "yes" in view of the other 160 million dollars so dedicated in the appropriation bill. Further, in view of the appropriation for economic development of this state contained in the general appropriation bill, the percentage of the funds which are being sent back for economic development within each county is also an ordinary expense of state government, since economic development certainly is a benefit to the state as well as each county. It certainly is obvious that working to develop economic base for this state is a competitive business, which certainly necessitates the expenditure of public funds.

In conclusion, the petitioners argue that this court is to safeguard the citizens of this state from the abuses of the legislature and executive branches of government. There is no question that is the role of this separate branch of government. The problem this justice has is finding an abuse in House Bill 1090. This legislation provides for the benefit of taxpayers rather than for the detriment. Further, it seems to be an exercise of good judgment to allow for credit when sending this additional money back to aid the education of the students of this state rather than just sending it back as merely more money to spend on whatever, with any amount of relief to the taxpayers being forsaken.

Article XII, § 2 of our state constitution is to safeguard public revenues from unwise or imprudent uses. *See State ex rel. Mills v. Wilder*, 73 S.D. 330, 42 N.W.2d 891 (1950); *State ex rel. Jensen v. Kelly*, 65 S.D. 345, 274 N.W. 319 (1937); *In re Limitation of Taxation*, 3 S.D. 456, 54 N.W.

417 (1893). This case does not involve an unwise or imprudent expenditure of public funds nor depict an unwise, bad faith, or ill-advised exercise of the legislative prerogative. Therefore, the judicial fortress should not block this relief to the taxpayers, however minimal. The permanent writ on Issue I should be denied and I would do so.