1999 SD 108

**Carlos CID and Medarda Cid, Appellants,**

v.

**SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES, Appellee.**

No. 20846.

Supreme Court of South Dakota.

Considered on Briefs June 1, 1999.

Decided Aug. 11, 1999.

Roberto A. Lange of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota Attorneys for appellants.

Mark Barnett, Attorney General, Anthony M. Sanchez, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee.

MILLER, Chief Justice.

[¶ 1.] In this appeal, we affirm the decision of the Department of Social Services (DSS), which terminated certain welfare benefits to a legal resident alien, and hold that the denial of such benefits does not violate a provision of the South Dakota Constitution, which prevents a distinction between resident aliens and citizens in reference to property.

## FACTS

[¶ 2.] Carlos Cid, who is of Chilean ancestry, has worked in the United States since 1979 and is a naturalized United States citizen. In 1994, he married Medarda Lagang, a Filipino, who at the time of the marriage had a son, Kevin. The marriage was performed in Puerto Rico

where Medarda and Kevin continued to reside until they entered the United States in December 1996. They are recognized as legal resident aliens with social security status.

[¶ 3.] In 1997, shortly after he suffered a heart attack which required him to undergo corrective heart surgery, Cid applied for certain welfare benefits for himself and his family.[1] DSS regulations in place at the time permitted the entire family to receive certain benefits.[2] However, the passage of the Welfare Reform Act in 1996[3] prompted DSS to promulgate new rules. The new rules were implemented in September 1997 and included changes in the regulations regarding the eligibility of resident aliens for certain welfare benefits.

[¶ 4.] In October 1997 DSS notified Cid that the change of regulations would affect the family's receipt of welfare benefits. The notice stated as follows:

Effective November 1, 1997, Medarda L. Cid and Kevin Lagang will no longer be eligible for TANF, medicaid, and food stamps as they do not meet eligibility requirements for aliens. 67:10:01:07 and 67:10:01:08.

[¶ 5.] Cid challenged the termination and DSS reversed the denial of certain welfare benefits to Kevin. However, it determined that the termination of Medarda's benefits was proper. Cid and Medarda (Cids) appealed to the circuit court, which affirmed the DSS decision.

[¶ 6.] From that decision Cids appeal, raising the following issues:

1. Whether the termination and denial of certain welfare benefits by DSS to Medarda Cid due to her status as a resident alien violate Article VI,

§ 14 of the South Dakota Constitution.

2. Whether the termination and denial of certain welfare benefits to Medarda Cid due to her status as a resident alien violate equal protection principles under the United States and South Dakota Constitutions.

3. Whether the reliance of DSS on conformity with federal law in revising state regulations and in terminating welfare benefits to Medarda Cid justifies or excuses the violation of Article IV, § 14 of the South Dakota Constitution.

## DECISION

[¶ 7.] **1. The termination and denial of certain welfare benefits to Medarda Cid due to her status as a resident alien did not violate Article VI, § 14 of the South Dakota Constitution.**

[¶ 8.] This appeal presents us with our first opportunity to interpret Article VI, § 14 of the South Dakota Constitution. It provides:

No distinction shall ever be made by law between resident aliens and citizens, in reference to the possession, enjoyment or descent of property.

[¶ 9.] Cids argue that DSS violated this provision when it denied Medarda certain welfare benefits. They claim that she possessed a property interest in such benefits; therefore, a distinction in law was made based upon her status as a resident alien. We disagree.

[¶ 10.] When determining the meaning of a constitutional provision, we must "give effect to the intent of the framers of the organic law and of the people

1. Cids' son Nelson was born in October 1997; however, benefits for him are not at issue here.

2. Cids received medicaid, food stamps, and Temporary Assistance for Needy Families (TANF), which replaced Aid to Families with Dependent Children.

3. The formal name for the Welfare Reform Act is the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. The provisions relating to aliens are codified at 8 U.S.C. §§ 1601–1646. Because the purpose of the Act is to further the nation's policy of self-sufficiency with respect to welfare and immigration, it places additional eligibility requirements on permanent legal aliens and individuals that are not citizens of the United States.

adopting it." *Poppen v. Walker*, 520 N.W.2d 238, 242 (S.D.1994) (citing *Schomer v. Scott*, 65 S.D. 353, 358, 274 N.W. 556, 559 (1937); *State v. Jorgenson*, 81 S.D. 447, 455–56, 136 N.W.2d 870, 875 (1965)). This Court "has the right to construe a constitutional provision in accordance with what it perceives to be its plain meaning." *Id.* (citing *State v. Neville*, 346 N.W.2d 425, 428 (S.D.1984)). If the words and language of the provision are unambiguous, "the language in the constitution must be applied as it reads." *In re Janklow*, 530 N.W.2d 367, 370 (S.D.1995) (citing *Levasseur v. Wheeldon*, 79 S.D. 442, 112 N.W.2d 894 (1962)). However, "[i]f the meaning of a term is unclear, the Court may look to the intent of the drafting body." *Poppen*, 520 N.W.2d at 242 (citing *Cummings v. Mickelson*, 495 N.W.2d 493, 499 (S.D.1993)).

[¶ 11.] In determining whether Article VI, § 14 is ambiguous, as it relates to this litigation, we must ascertain whether the term "property" is susceptible to more than one meaning. *See Poppen*, 520 N.W.2d at 242. Clearly, such is the case. "Property" has been defined as "a quality or trait belonging and ... peculiar to an individual or thing." Webster's New Collegiate Dictionary 916 (1979). It has also been defined as "something owned or possessed" and as "something to which a person has a legal title." *Id.* In addition, the definition includes "that which belongs exclusively to one" and "everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal." Black's Law Dictionary 1216 (6th Ed.1990).

[¶ 12.] Further, this Court has previously interpreted the term "property" in Arti-cle XI of the South Dakota Constitution by examining the framers' intent. *See National Surety Co. v. Starkey*, 41 S.D. 356, 360–61, 170 N.W. 582, 583 (1919) (interpreting Article XI, § 7 of the South Dakota Constitution); *Ewert v. Taylor*, 38 S.D. 124, 158, 160 N.W. 797, 808 (1916) (interpreting Article XI, § 2 of the South Dakota Constitution and finding that it was proper to tax property as a unit). We found "property" to mean "the thing of which there may be ownership as distinguished from the right to possess and use the thing." *Ewert*, 38 S.D. at 141, 160 N.W. at 801. We concluded that such definition included "everything of value, tangible or intangible, capable of being the subject of individual right or ownership." *Nat'l Surety*, 41 S.D. at 360, 170 N.W. at 583. However, we also recognized that the definition had limitations and could not be all encompassing. *See id.* at 364–65, 170 N.W. at 585 (finding that bonds "were not intended to be included in the term 'property' ... as such terms are used in our Constitution relating to taxation"). We find such limitation exists here.

[¶ 13.] With the definition so limited and the obvious ambiguity of the term, it is clear that we cannot "apply the language as it reads." *See Janklow*, 530 N.W.2d at 370 (citation omitted). We must then look to the intent of the drafting body to determine the provision's meaning. *See Poppen*, 520 N.W.2d at 242 (citation omitted).

[¶ 14.] We recognize that the language of Article VI, § 14 has remained constant since its adoption,[4] and the provision has never been amended.[5] Therefore, when examining the constitutional framers' intent, we cannot accept that, in a provision that predates statehood, the intended

---

4. Originally, this provision was included in Article II, § 15 of the South Dakota Constitution.

5. In 1975, a proposal to amend the Bill of Rights was defeated. *See* 1975 SD Session Laws ch. 3. The proposed provision would have read as follows:

Equality of rights and treatment of all persons shall not be denied or abridged by the state or its political subdivisions on ac-count of race, color, creed, sex, ancestry, religion, or national origin.

In employment and in the sale or rental of property, equality of rights and of treatment of all persons shall not be denied or abridged by any person, corporation or association on account of race, color, creed, sex, ancestry, religion, or national origin. The Legislature may establish by law additional prohibitions and reasonable exemptions.

meaning of "property" included certain benefits from welfare programs that were enacted nearly one-half century later.[6] To expand the framers' language and use of the term to include an interest in welfare benefits would simply be too great a stretch to make, and we refuse to expand the term's definition in such a way. Thus, we conclude that the denial and termination of certain welfare benefits to Medarda Cid did not violate Article VI, § 14 of the South Dakota Constitution.

**[¶ 15.] 2. The termination and denial of certain welfare benefits to Medarda Cid due to her status as a resident alien did not violate equal protection principles under either the United States or South Dakota Constitutions.**

■ [¶ 16.] Cids point to South Dakota Administrative Rule 67:10:01:08 and the Welfare Reform Act as violative of the equal protection clause. The rule provides that "[a] qualified alien is ineligible for assistance under this article for five years unless the alien meets the requirements contained in Pub.L. 104–193, 402(b)(2) (110 Stat. 2264) (August 22, 1996)."[7] Cids claim that, because the rule denies benefits to certain resident aliens like Medarda, while allowing other resident aliens to obtain benefits, it violates the equal protection clauses of the United States and South Dakota Constitutions.[8] We disagree.

[¶ 17.] Cids claim that classifications based upon nationality and alienage are inherently suspect; therefore, they are subject to strict scrutiny analysis. They rely on *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), to support their claim. In *Graham*, the United States Supreme Court reviewed two state statutes to determine whether such statutes violated the equal protection clause: (1) an Arizona statute that required citizenship or a residency period of fifteen years as a prerequisite to receiving certain benefits; and (2) a Pennsylvania statute that extended benefits only to United States citizens. *Id.* at 367–68, 91 S.Ct. at 1849–50, 29 L.Ed.2d at 539. The statutes were inconsistent with national policy and law and placed additional burdens upon those subject to their provisions.[9] *Id.* at 376–77, 91 S.Ct. at 1854, 29 L.Ed.2d at 544. The Supreme Court has long recognized that states are prohibited from adding to, or taking from, "conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Id.* at 378, 91 S.Ct. at 1855, 29 L.Ed.2d at 545 (quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478, 1487 (1948)). There-

---

6. The Aid to Dependent Children program, which was later changed to the Aid to Families with Dependent Children program and is now the TANF program, was established in 1935. The federally subsidized food stamps program and the Medicaid program were enacted almost thirty years after the ADC program. *See* 7 U.S.C. §§ 2011–2036; 42 U.S.C. §§ 601–681.

7. Under Pub.L. 104–193, 402(b)(2) (110 Stat 2264), which is codified at 8 U.S.C. § 1612(a)(2), certain qualified aliens are eligible to receive benefits. They include: (1) certain refugees and asylees; (2) permanent resident aliens who have worked or can be credited with forty qualifying quarters; (3) veterans and active duty military personnel and their spouses or dependent child(ren).

8. The Fourteenth Amendment to the United States Constitution states, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Article VI, § 18 of the South Dakota Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities upon which the same terms shall not equally belong to all citizens or corporations."

9. In *Graham*, the Supreme Court stated that it had "no occasion to decide whether Congress, in the exercise of the immigration and naturalization power, could itself enact a statute imposing on aliens a uniform nationwide residency requirement as a condition of federally funded welfare benefits." 403 U.S. at 382 n. 14, 91 S.Ct. at 1857 n. 14, 29 L.Ed.2d at 548 n. 14.

fore, when determining the level of scrutiny under which the state statutes were to be reviewed, the Supreme Court stated that "the classifications [based on alienage] ... are inherently suspect and are therefore subject to strict judicial scrutiny[.]" *Id.* at 376, 91 S.Ct. at 1854, 29 L.Ed.2d at 544.

[¶ 18.] When determining whether the heightened level of scrutiny employed in *Graham* is applicable here, we believe it necessary to consider the facts before us. First, no state statute is involved, but rather an administrative rule promulgated to implement federal legislation. Further, Cids make no claim that South Dakota has adopted any rule or legislation that is in conflict with national policies regarding alienage, or that places any burdens, other than those contemplated in the federal law, on those subject to its provisions. In fact, Cids state that the challenged rule is consistent with the Welfare Reform Act, and our review establishes that rational basis scrutiny has been employed by the federal courts that have addressed the issue of whether the Welfare Reform Act violates equal protection principles. *Kiev v. Glickman,* 991 F.Supp. 1090, 1099 (D.Minn. 1998); *see Rodriguez v. United States,* 169 F.3d 1342, 1350 (11th Cir.1999); *Sinelnikov v. Shalala,* No. 97C 4884, 1998 WL 164889, *11 (N.D.Ill. March 31, 1998). Therefore, such facts cause us to conclude that the case before us is clearly distinguishable from *Graham.* As such, the heightened scrutiny required in *Graham* is not applicable here. We find that the rational basis test is the most appropriate for our analysis.[10]

[¶ 19.] This Court has established a two-prong test for analyzing equal protection issues under rational basis scrutiny. The Court must determine:

(1) [W]hether the [rule] does set up arbitrary classifications among various persons subject to it.

(2) [W]hether there is a rational relationship between the classification and some legitimate legislative purpose.

*CRSTTA v. PUC of South Dakota,* 1999 SD 60, ¶ 46, 595 N.W.2d 604, 614 (citing *Lyons v. Lederle Lab.,* 440 N.W.2d 769, 771 (S.D.1989)).

[¶ 20.] When applying the first prong of the test to the facts of this case, it is clear that the language of ARSD 67:10:01:08 does not apply equally to all people and provides for differing classifications among aliens. *See SD Physician's Health Group v. State,* 447 N.W.2d 511, 515 (S.D.1989) (quoting *Lyons,* 440 N.W.2d at 771) (stating that when applying the first prong this Court must "look to see if the [rule] applies equally to all people"). Because the rule denies benefits to those aliens who have not lived in the United States for five years unless certain exceptions are met, not all aliens are classified in the same manner. *See* 8 U.S.C. § 1612.

[¶ 21.] However, classifying aliens differently does not equate to an equal protection violation, unless the classifications are not rationally related to some legitimate government purpose. *SD Physician's Health Group,* 447 N.W.2d at 515. We find that such a rational relationship exists. Clearly, DSS has a legitimate interest in implementing the nation's immigration policy and its uniform rules with respect to alien eligibility for public benefits. *See* 8 U.S.C. § 1601(7).[11] In addi-

---

**10.** We believe that, even if we were to employ strict scrutiny analysis in this case, the challenged rule would pass such review. This Court has recognized that, when employing strict scrutiny analysis, we must determine whether a compelling state interest exists for such a classification and whether the rule provides the least restrictive means of achieving that interest. We find that the State has a compelling interest in implementing the national immigration policy and in implementing uniform rules regarding alien eligibility for certain welfare benefits. We conclude that DSS's promulgation and implementation of rules to achieve the State's interests are the least restrictive means for such achievement.

**11.** The statute provides as follows:

With respect to the State authority to make determinations concerning the eligi-

tion, DSS has a legitimate interest, as stated by the federal government, of "assuring that aliens be self-reliant in accordance with national immigration policy." *Id.* DSS's promulgation and implementation of rules further the State's (DSS's) legitimate interest. Therefore, the DSS rule, which mirrors the Act's provisions, passes rational basis scrutiny, and its implementation does not constitute a denial of equal protection under the law. *See Rodriguez,* 169 F.3d at 1352 (stating that the provisions of the Welfare Reform Act found at 8 U.S.C. § 1612 passed rational basis scrutiny; therefore no violation of the equal protection clause occurred); *Kiev,* 991 F.Supp. at 1100 (stating that "the Welfare Reform Act does not violate the Equal Protection Clause of the Fifth Amendment, as it is rationally related to legitimate governmental interests"); *Sinelnikov,* 1998 WL 164889, at *12 (stating the provisions of Welfare Reform Act "affecting non-citizens' ability to obtain welfare benefits must stand").

[¶ 22.] In addition, because of our resolution of issue one, we need not address the other issue Cids raise on appeal.

[¶ 23.] Affirmed.

[¶ 24.] SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

bility of qualified aliens for public benefits in this title, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling government interest of assuring that aliens be self-reliant in accordance with national immigration policy.