2001 SD 147

Gerald F. APA, Patricia deHueck, H. Paul Dennert, Quinten L. Burg, Burt B. Elliott, Larry Frost, James (Jim) E. Hundstad, Barry Jensen, Ted A. Klaudt, Bill Napoli, Mel K. Olson, Jarvis W. Brown and Duane Sutton, Petitioners,

v.

Dick BUTLER, Treasurer; Vernon Larson, Auditor; and Gary Viken, Secretary of Revenue of the State of South Dakota, Respondents.

No. 21942.

Supreme Court of South Dakota.

Argued Aug. 30, 2001.

Decided Dec. 19, 2001.

---

6. Linda L. Hale, Ph.D. and Julie Underwood, J.D., Ph.D., *Child Abuse: Helping Kids Who Are Hurting*, 74 MarqLRev 560, 573 (1991).

Jack Theeler and John F. Cogley of Morgan, Theeler and Cogley, Mitchell, South Dakota, Attorneys for Petitioners.

Mark Barnett, Attorney General, Jeffrey P. Hallem, Assistant Attorney General, Pierre, South Dakota, Attorneys for Respondents.

KONENKAMP, Justice.

[¶ 1.] Petitioners, a group of South Dakota state legislators who served during the 2001 legislative session, request a peremptory writ of prohibition against the State Treasurer, the State Auditor, and the Secretary of Revenue. Petitioners seek to bar these officials from paying out, disbursing, or allocating funds from the South Dakota Bred Racing Fund and the Special Racing Revolving Fund under certain appropriations in the 2001 general appropriations bill. We deny the writ.

**Background**

[¶ 2.] The South Dakota Bred Racing Fund is authorized in SDCL 42–7–71:

> One-fourth of all money received by the state treasurer under this chapter from licensees operating horse racing tracks shall be placed in a special revenue fund to be known as the "South Dakota-bred racing fund." *The fund shall be used by the commission to encourage horse racing and the raising and breeding of horses in South Dakota and shall be used for the purpose of providing compensation to South Dakota-bred horses by providing funds to all horsetracks licensed in South Dakota.* However, not more than one-fourth of the moneys deposited in the South Dakota-bred racing fund may be used by the commission to provide purse supplements to horsetracks for horses other than South Dakota-bred horses. (emphasis added).

In a similar fashion, the Special Racing Revolving Fund is authorized in SDCL 42–7–79.1:

> In addition to the deductions authorized by § 42–7–79, the dog racing licensees shall deduct from the total sum contributed on dog races, except contributions on dog races in the win, place and show pool, an additional three and three-quarters percent on the dollars contributed. The licensee will retain one-quarter of one percent for capital improvements on all amounts contributed and an additional three and one-half percent shall be retained by the licensee for discretionary use. *The special racing revolving*

*fund shall be in the office of the state treasurer to be disbursed by the commission to increase purses or for operations, or upon request, funds may be granted to a political subdivision of the state for unusual or unique law enforcement expenses incidental to having a race track or off-track site in that political subdivision. Funds in the South Dakota-bred racing fund and the special racing revolving fund shall be disbursed by the commission on warrants drawn by the state auditor on vouchers approved by the commission and such funds shall be disbursed without authority of appropriation acts.* (emphasis added).

[¶ 3.] During the 2001 session, the legislature considered three bills involving the Bred Racing Fund and the Special Racing Revolving Fund. Senate Bill 51 proposed to transfer money from each fund to the Department of Social Services for grants to establish or maintain shelters or programs for domestic abuse victims. The bill failed to pass the Senate. Senate Bill 176 sought to amend SDCL 42–7–71 and 42–7–79.1 to permit money in the two racing funds to .be used for other purposes provided by the legislature. Although this bill passed the Senate, it failed to pass in the House. Finally, House Bill 1285 would have transferred money from each of the racing funds to help fund the State Fair. After numerous amendments, the bill passed the House. Additional amendments were made in the Senate and the bill ultimately passed that chamber. However, the House failed to concur in the Senate amendments, refused to accept the report of a conference committee, and failed to appoint a new conference committee to work out the differences in the bill. Thus the bill failed.

[¶ 4.] After the demise of Senate Bills 51 and 176 and House Bill 1285, House Bill 1233, the general appropriations bill, was amended during a joint meeting of the House and Senate Appropriations Committees. Section 26 of the bill was amended to make the following pertinent appropriations from the Bred Racing Fund and the Special Racing Revolving Fund:

Section 26. The state treasurer shall transfer to the state general fund money from the following funds for the purposes herein indicated:

\* \* \*

From the South Dakota Bred Racing Fund:

Department of Health—Health Systems Development and Regulation $1,000,000

Department of Social Services—Adult Services and Aging $125,000

From the Special Racing Revolving Fund:

Department of Agriculture—Resource Conservation and Forestry $300,000

Department of Agriculture—State Fair $700,000

Department of Social Services—Adult Services and Aging $125,000

[¶ 5.] House Bill 1233 was ultimately passed by the legislature and petitioners brought this suit to stop the fund transfers authorized by section 26. As a basis for issuance of a writ of prohibition, petitioners argue that these appropriations from the Bred Racing Fund and the Special Racing Revolving Fund violate provisions of the South Dakota Constitution and are therefore void.

### Availability of the Writ

[¶ 6.] Writs of prohibition offer an extraordinary remedy, available only in the absence of no other "plain, speedy and adequate remedy in the ordinary course of law." *Sioux Falls Argus Leader v. Miller*, 2000 SD 63, ¶ 4, 610 N.W.2d 76, 80 (quot-

ing SDCL 21–30–2). By longstanding precedent in South Dakota

> any taxpayer or elector may maintain a proceeding to restrain a public officer from the performance of an illegal act, where the Attorney General has refused to prosecute the action in the name of the state, and where the relief sought is a public matter, or one of public right. In such case it is not necessary that the taxpayer or elector have a special interest in the suit or suffer special injury to himself.

*State v. Youngquist*, 69 S.D. 423, 426, 11 N.W.2d 84, 85 (1943). Thus, in *Duxbury v. Harding*, 490 N.W.2d 740 (S.D.1992), this Court issued a writ of prohibition on the petition of a group of state legislators to prevent the disbursement or allocation of certain appropriated funds on the basis that the appropriations were invalid. Petitioners mount a similar challenge here.

[¶ 7.] Applying the requirements of *Youngquist, supra*, petitioners allege that they are taxpayers and duly qualified legislators and electors. Respondents raise no view to the contrary. While petitioners have not alleged that the Attorney General refused to bring this action, the Attorney General's representation of the respondents forebodes the futility of any such request. Finally, as resolved in *Youngquist*, "[t]he constitutionality of legislation affecting the use of public funds is a matter of public right." *Youngquist*, 69 S.D. at 426, 11 N.W.2d at 85. Accordingly, petitioners are entitled to maintain this proceeding.

## 1. Article XII, § 2—Amendment of Existing Law

[¶ 8.] Article XII, § 2 of the South Dakota Constitution provides:

> *The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools.* All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature. (emphasis added).

[¶ 9.] Under the language emphasized above, this Court has held that "while the Legislature is free to impose conditions and restrictions on appropriated funds within the body of a general appropriations bill, it may not substantively legislate in that bill in a manner that changes, amends or repeals existing law." *South Dakota Ed. Ass'n v. Barnett*, 1998 SD 84, ¶ 19, 582 N.W.2d 386, 392. Petitioners argue that the challenged appropriations in section 26 of House Bill 1233 violate this restriction by changing, amending, or repealing the existing law on the permissible use of funds contained in the South Dakota Bred Racing Fund and the Special Racing Revolving Fund.

[¶ 10.] We presume the constitutionality of legislative enactments, and that presumption stands until it is unmistakably overcome by proof beyond a reasonable doubt. *Poppen v. Walker*, 520 N.W.2d 238, 241 (S.D.1994) (citations omitted). This Court's prior decisions on the nature of special funds such as the Bred Racing Fund and the Special Racing Revolving Fund resolve petitioners' constitutional arguments.

[¶ 11.] As early as 1914, this Court considered the nature of special funds set aside by the legislature for specific purposes. In *State v. Anderson*, 33 S.D. 574, 146 N.W. 703 (1914), a petitioner sought a writ of prohibition to prohibit the State Auditor from drawing and issuing warrants against certain special funds including: the Insurance Department Fund; the

Special Militia Fund; the Game Fund; the Dairy Fund; the Public Examiner's Contingent Fund; the Fire Marshal Fund; and the Stock Food Fund. *Id.* These funds were accumulated from various licenses, fees, fines, and special taxes. Each of the acts creating these funds contained provisions purporting to set aside the moneys received for certain specified purposes including expenses incident to enforcing and carrying out the goals of the different acts. The Auditor recognized these provisions as *appropriations* authorizing the drawing of warrants against the special funds. This Court rejected the argument that these *appropriations* were unconstitutional, noting in part:

> The failure of the people to so restrict the Legislature so that its appropriations must be in some stated amount may be unwise, but it is clear that, if the Constitution does not place any restriction upon its power in this respect, the court cannot. Undoubtedly the leading authority upon the question of what is a valid appropriation under a Constitution is the case of *Ristine v. State*, 20 Ind. 328, wherein is to be found a discussion of the origin and history of the constitutional restrictions on appropriations of public funds. This case goes fully into the essentials of a valid appropriation, and says: *"An appropriation may be made in different modes. It may be made by an act setting apart and specially appropriating the money derived from a particular source of revenue to a particular purpose. . . ."*

*Anderson,* 33 S.D. at 580–581, 146 N.W. at 705 (emphasis added).

[¶ 12.] This Court also considered the nature of special funds in *State v. Kelly,* 65 S.D. 345, 274 N.W. 319 (1937). There, the legislature passed an act providing for the manufacture, sale, control, and disposition

of intoxicating liquor. A section of the act provided for the disposition of funds derived from licenses and taxes imposed by the act. The funds were to be credited to the Law Enforcement Fund and appropriated to the use of the Department of Justice and Public Safety and for the payment of expenses of the Liquor Control Commission. It was argued that the attempted appropriation of funds in one bill for separate agencies violated the provision of SD Const art XII, § 2 that special appropriations "be made by separate bills, each embracing but one object[.]" The *Kelly* Court agreed holding:

> The *appropriation* under consideration is a direct violation of such constitutional provision. A *continuing appropriation* for the support and maintenance of the Liquor Control Commission and the Department of Justice and Public Safety is not for a single object or purpose. To uphold a *special appropriation bill* providing funds for separate and distinct departments, institutions, or agencies of the state government is to permit the objectionable practice at which the constitutional provision under consideration is directed. The attempted *appropriation* is void and of no effect, and the application for a writ of prohibition is therefore granted.

*Kelly,* 65 S.D. at 353, 274 N.W. at 323 (emphasis added). In reaching this conclusion, this Court commented that, "[b]y the act in question the Legislature clearly intended to create a *continuing appropriation.*" *Kelly,* 65 S.D. at 351, 274 N.W. at 322 (emphasis added).

[¶ 13.] *Anderson* and *Kelly* injected a category of appropriation into South Dakota law not explicitly recognized in the South Dakota Constitution, *i.e.,* the continuing appropriation.[1] This Court has

---

1. *Kelly* made clear that continuing appropria-    tions are subject to the voting requirements

continued to recognize the existence of continuing appropriations in state law ever since *Anderson* and *Kelly. See State ex rel. Maloney v. Wells*, 79 S.D. 389, 400–401, 112 N.W.2d 601, 606–607 (S.D. 1961)(law creating employment security administration fund established a continuing appropriation for a definite purpose); *Candee Const. v. Dep't of Transp.*, 447 N.W.2d 339, 344 (S.D.1989)(statute providing that judgments relating to contracts with the South Dakota Department of Transportation must be paid out of the state highway fund provides a continuing appropriation for damages awarded and costs assessed against the State as a result of an action against the Department).

■ [¶ 14.] Classifying special funds created by the legislature for specific purposes as appropriations is extremely important in our inquiry because:

> [a]n appropriation bill is not a law, in its ordinary sense. It is not a rule of action. It has no moral or divine sanction. It defines no rights and punishes no wrongs. It is purely lex scripta. It is a means only to the enforcement of law, the maintenance of good order, and the life of the state government. Such bills pertain only to the administrative functions of government.

*State v. Clausen*, 85 Wash. 260, 148 P. 28, 32 (1915). This Court has previously echoed the view that appropriations bills are administrative in nature, holding in *State ex rel. Oster v. Jorgenson*, 81 S.D. 447, 450, 136 N.W.2d 870, 872 (1965) that:

> [a] general appropriation bill is not legislation in the true sense of the term. It is as its language implies "a setting apart of the funds necessary for the use and maintenance of the various departments of the state government already in existence and functioning.... In providing that it should embrace nothing

for special appropriations contained in SD

else, the framers of the Constitution undoubtedly intended that members of the legislature should be free to vote on it knowing that appropriations and nothing else were involved." *Sellers v. Frohmiller*, 42 Ariz. 239, 24 P.2d 666.

■ [¶ 15.] Given the administrative aspect of appropriations bills, the legislature "has power to alter, change, or transfer an appropriation, unless the appropriation has been pledged by constitutional or statutory provisions to the payment of some obligation under circumstances where the charge on such appropriation has become a vested right." 81A CJS *States* § 241 (1977). Consistent with this rule, this Court has previously recognized the legislature's authority to transfer appropriations from special funds. In *In re Opinion of the Judges*, 48 S.D. 253, 203 N.W. 462 (1925), the legislature appropriated $300,000 as rural credit funds between 1917 and 1919. In addition, funds received from the sale of state bonds authorized by the Rural Credits Act were made rural credit funds as were sums received on the principal and interest of loans made by the Rural Credit Board. In 1925, the legislature passed an act providing for an investigating commission to audit the Rural Credit Department. A provision of the act made the expenses of the commission payable out of the rural credit funds. The Governor questioned the validity of the provision in a request for an advisory opinion from this Court, where it was held that the provision was a valid appropriation:

> We are therefore of the opinion that not only may the residue in the two appropriations above referred to be used for the payment of the expenses of the Interim Commission, but also that any funds under the control of the rural credit board may be so used except the funds that may be raised by the said

Const art XII, § 2.

Tax Commission levy. No other points of attack upon the appropriation in question occur to us.

*Opinion of the Judges*, 48 S.D. at 257, 203 N.W. at 463.

[¶ 16.] In *Youngquist, supra,* an act of the 1943 legislature reduced the continuing appropriations of eighteen governmental departments by transferring a part of their tax receipts to the general fund where the funds were to be mingled with other tax collections and used to meet appropriations payable out of the general fund. This Court upheld the transfer,[2] but did grant a writ of prohibition to permit a referendum on the act itself.[3]

[¶ 17.] Based upon the foregoing, it is clear that the legislature may transfer money subject to a prior continuing appropriation in a special fund to the general fund and reappropriate that money for new purposes.[4] That is precisely what occurred here in section 26 of the general appropriations bill. The transfers under consideration in *In re Opinion of the Judges* and *Youngquist* were only slightly different because the transfers in those cases were carried out in individual bills while the transfers here were carried out as part of the general appropriations bill. However, at least two courts have addressed the issue of whether a legislature may properly reappropriate money from a special fund in a general appropriations bill. Those courts have come to op-

posite conclusions. In *Childree v. Hubbert*, 524 So.2d 336 (Ala.1988), the Alabama Supreme Court held that any appropriations bill appropriating education trust funds other than as specified in the acts creating the funds and in the state code would violate the section of the state constitution limiting appropriations bills to the subject of appropriations. The court also held that such an appropriations bill would violate the constitutional provision limiting bills to one subject. These holdings, however, were based upon a view that the legislature's creation of a special fund is *not* an appropriation, but merely an "earmarking" of funds. Thus, the Alabama court reasoned:

> If earmarking is not appropriating, but rather a matter properly included in a revenue bill, the converse is also true: the removal or disregard of earmarking is not a matter properly to be included in an appropriation bill. Presumably, the earmarking could be removed in a proper single-subject bill or in a properly constituted revenue bill, but until such an action is taken, no appropriation bill can appropriate such funds other than as they were earmarked.

*Childree*, 524 So.2d at 341.

[¶ 18.] In contrast with Alabama, the South Dakota decisions discussed above view the legislature's creation of a special fund as an appropriation. The Florida Supreme Court reached the following con-

---

2. The only part of the transfer not upheld was the transfer of certain highway funds that this Court found to be constitutionally dedicated for highway purposes. *See Youngquist,* 69 S.D. at 427–28, 11 N.W.2d at 86.

3. This Court also held that the transfer was *not* an appropriation. However, the act in *Youngquist* did not reappropriate the funds transferred to the general fund. This distinguishes *Youngquist* in an important respect from the challenged appropriations in this case.

4. This is, of course, subject to the limitation noted in *CJS* and in *In re Opinion of the Judges* against the transfer of any money subject to a charge that has become a vested right or trust. *See* 81A CJS *States* § 241 (1977); *In re Opinion of the Judges,* 48 S.D. at 257, 203 N.W. at 463. A similar limitation is recognized in the reversion of appropriated funds to the general fund inasmuch as reversion is limited to funds that have not been "contractually obligated." *See* SDCL 4–8–19 & 4–8–21.

clusion on the issue of whether a legislature may reappropriate money from a special fund in a general appropriations bill: "We find no constitutional impediment to a General Appropriations Bill making allocations of State funds for a previously authorized purpose in amounts different from those previously allocated or substituting adequate specific appropriations for prior continuing appropriations." *In re Opinion to the Governor*, 239 So.2d 1, 10 (Fla.1970). The Florida Supreme Court reaffirmed this conclusion in *Brown v. Firestone*, 382 So.2d 654, 664 (Fla.1980):

> [A]n appropriations bill must not change or amend existing law on subjects other than appropriations. *This is, of course, subject to our statement in In re Advisory Opinion to the Governor, 239 So.2d at 10, that a general appropriations bill may make "allocations of State funds for a previously authorized purpose in amounts different from those previously allocated or [substitute] adequate specific appropriations for prior continuing appropriations."* (emphasis added).

[¶ 19.] In another Florida case, *Chiles v. Milligan*, 682 So.2d 74 (Fla.1996), the governor petitioned the Florida Supreme Court for a writ of mandamus declaring certain conditions in the general appropriations bill unconstitutional. The conditions were placed upon the expenditure of funds appropriated for certain programs. However, preexisting statutes already contained guidelines directing how funds appropriated to those programs should be spent. The Florida court struck down the conditions holding that they would unconstitutionally amend or change an existing law on a subject other than appropriations. Our case, however, presents a different scenario than that confronted in *Chiles*. Nothing in House Bill 1233 purports to amend or change the purposes for which Bred Racing Funds or Racing Revolving Funds may be spent. Rather, the bill transfers funds previously subject to a continuing appropriation for those purposes to the general fund and reappropriates those funds. As *Chiles* itself notes, "[a]n appropriations bill can, of course, modify an existing law directed at appropriations." *Chiles*, 682 So.2d at 76, n. 3.

[¶ 20.] Based upon the foregoing, we hold that modification of an appropriation is a proper subject in a general appropriations bill. *See Chiles, supra* (appropriations bill can modify existing law directed at appropriations). Therefore, we conclude that the challenged appropriations do not violate article XII, § 2 of the South Dakota Constitution by changing, amending, or repealing existing law on subjects other than appropriations. *See Barnett, supra.*[5]

### 2. Article XII, § 2—Amendment of Special Appropriation

[¶ 21.] Article XII, § 2 of the South Dakota Constitution provides:

---

5. The dissent focuses solely on the rule that the Legislature may not pass substantive legislation in the general appropriations bill, but it fails to address two other important rules that have been legitimately raised, briefed and argued by the respondents: first, the Legislature has power to alter, change, or transfer a prior appropriation; and, second, the Legislature can use a general appropriations bill to modify an existing law directed at appropriations. We cannot ignore two-thirds of the equation at issue here. The dissent's question concerning our reliance on *Kelly, supra* is answered by the fact that *Kelly* along with *Anderson,* *supra, Maloney, supra* and *Candee Const., supra* are all South Dakota cases where this Court has reviewed legislation creating special funds for specific purposes as *appropriations measures*. Consistent with that view, we simply hold here that the statutes creating the Bred Racing Fund and the Racing Revolving Fund are appropriations measures subject to the rule that an existing law directed at appropriations can be modified in a general appropriations bill. Finally, the dissent raises an alarm that our result here means there is nothing to prevent the transfer of money from

The general appropriation bill shall embrace nothing but appropriations for *ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions*, interest on the public debt, and for common schools. All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature. (emphasis added).

This Court has interpreted the above-emphasized language in SD Const art XII, § 2 as providing the following limitations:

This constitutional provision allows a legislative majority to appropriate funds for the ordinary expenses of state government and denies to a minority the power to prevent, obstruct, or stop the operation of the vital affairs of government by denying those necessary funds. But the door to the state treasury is not so easily opened as to "all other appropriations." They must be the single subject of separate bills and receive the affirmative approval of two-thirds of all members of both houses of the legislature. Matters which could be included in the general appropriation bill may be the subjects of special appropriation bills without nullifying consequences. However, appropriations included within the general appropriation bill outside of and beyond its scope are void.

*Oster*, 81 S.D. at 452, 136 N.W.2d at 873.

[¶ 22.] Petitioners argue that the challenged appropriations are special appropriations that should have been the single subject of separate bills requiring two-thirds majority approval in both houses of the legislature. As such, petitioners contend the challenged appropriations are outside the scope of the general appropriations bill and are, therefore, void.

[¶ 23.] This Court has not specifically defined special appropriations that fall outside the scope of the general appropriations bill under SD Const art XII, § 2. The *Oster* Court, however, did exhaustively analyze the terms "ordinary expenses of the executive, legislative and judicial departments of the state" and "current expenses of state institutions" to determine whether certain appropriations were properly included in the 1965 general appropriations bill. In its analysis, the Court repeatedly emphasized the distinction between "ordinary expenses" properly included in a general appropriations law and "extraordinary expenses" subject to the separate bill-two-thirds vote requirement of article XII, § 2. Quoting *In re Limitation of Taxation*, 3 S.D. 456, 54 N.W. 417 (S.D.1893), the Court noted article XII, § 2 had undertaken to "guard the taxpayers and the public treasury against hasty and ill-advised outlays for *extraordinary expenses* [.]" *Oster*, 81 S.D. at 453, 136 N.W.2d at 873 (emphasis added). It provided examples of these "extraordinary expenses" such as "an approaching pestilence, or to make temporary provision for the patients of the insane hospital, unhoused and scattered by a devastating fire, or for any other *exceptional and extraordinary object essential to the welfare*

any special fund to the general fund for any ordinary expense. While that may be true, it has been true since 1943 when this Court upheld the Legislature's reduction of the continuing appropriations of eighteen governmental departments (including the Racing Commission) and the transfer of part of their receipts to the general fund to meet appropriations payable out of the general fund. *See Youngquist, supra.* South Dakota survived that case unharmed.

*of the state."* *Id.,* 81 S.D. at 454–455, 136 N.W.2d at 874 (emphasis added). The Court went on to cite with approval the following dictionary definition of "ordinary" and "current" expenses:

> Black's Law Dictionary, 4th Ed, defines the word "ordinary" in its adjectival sense as "Regular; usual; normal; common; often recurring; according to established order; settled; customary; reasonable; not characterized by peculiar or unusual circumstances ..." and the same source defines the term "current expense" as "Ordinary, regular, and continuing expenditures for the maintenance of property, the carrying on of an office, municipal government etc."

*Id.*

[¶ 24.] In addition to the foregoing, the Court cited Montana and Ohio court decisions defining ordinary and current expenses as follows:

> The court [in *Miller Ins. Agency v. Porter,* 93 Mont. 567, 20 P.2d 643] said ordinary expenses include the current expenses of the government and "Any expense which recurs from time to time and is to be reasonably anticipated as likely to occur in order for the proper operation ... of the state government ..." Similarly the Ohio court in *State ex rel. Jones* [*Janes*] *v. Brown,* 112 Ohio St. 590, 148 N.E. 95, said the phrase "current expenses of the state government and state institutions" in addition to those incident to officering and maintaining the state government "includes the preserving in repair and maintaining the property of the state government, and, as applied to roads, includes the maintaining and repairing thereof, as distinguished from new construction".

*Id.*

[¶ 25.] Based upon this analysis, the *Oster* Court considered sixty-eight separate appropriations and struck ten as beyond the scope of the general appropriations bill. Of those ten, eight were appropriations for new construction, one was an appropriation for land acquisition, and one appropriated funds for road maintenance in violation of a separate constitutional provision on road construction.

[¶ 26.] The Court followed its decision in *Oster* in *Duxbury, supra.* *Duxbury* adopted the following definition of ordinary and current expenses from *Oster* to resolve whether three different appropriations in the 1992 General Appropriations Bill were beyond the scope of that act:

> [T]he term "ordinary expenses of the executive, legislative and judicial departments of the state" [is construed] to mean any related expense which recurs with regularity and certainty. The term "current expenses of state institutions" on the other hand is equivalent to "running expenses" which includes any usual, regular, and continuing expenditure for maintenance of property and for conducting the regular and authorized functions of the institution.... Extraordinary, emergent, and exceptional expenses for any purpose likewise fall within the category of "All other appropriations."

*Duxbury,* 490 N.W.2d at 744 (quoting *Oster,* 81 S.D. at 456, 136 N.W.2d at 875). The Court went on to strike all three appropriations at issue in *Duxbury* as beyond the scope of the general appropriations bill: an appropriation for property tax credits; an appropriation for construction of a National Guard Armory; and an appropriation to reimburse counties for presidential primary expenses.

[¶ 27.] *Oster* and *Duxbury* use the following terminology in defining the concept of "ordinary and current expenses of state

government"—regular; usual; normal; common; often recurring; according to established order; settled; customary; reasonable; not characterized by peculiar or unusual circumstances; continuing expenditures for maintenance or carrying on an office; current expenses of government; expenses recurring from time to time; expenses reasonably anticipated as likely to occur; expenses incident to officing and maintaining state government; expenses incident to preserving in repair and maintaining state property; expenses recurring with regularity and certainty; running expenses; usual, regular and continuing expenses for maintenance of property and for conducting regular and authorized functions. In contrast, the following terms are used in describing extraordinary expenses: exceptional and extraordinary objects essential to the welfare of the state; extraordinary, emergent and exceptional expenses for any purpose.

[¶ 28.] Given these definitions, none of the challenged appropriations fall into the category of extraordinary expenses beyond the scope of the general appropriations bill and subject to the separate bill-two-thirds vote requirement of SD Const art XII, § 2. First, with regard to the state fair appropriation, statutes requiring that a state fair be held date back to at least 1903 and statutes appropriating funds for that purpose are of the same vintage. *See* SDCL 1–21–9; 1–21–14. The respondents establish by affidavit that funds from the appropriation will be expended for the operating expenses [6] of the State Fair and petitioners provide no evidence to the contrary. Thus, any suggestion that the appropriation of funds for holding the State Fair is a type of extraordinary, emergent, or exceptional expense is without merit.

[¶ 29.] Second, the two appropriations to the Department of Social Services, Division of Adult Services and Aging are also apportioned for ordinary expenses of state government. The respondents establish by affidavit that the funds appropriated to the Division will be used for the Domestic Abuse and Sexual Abuse (DASA) Program. This program was enacted by the legislature in 1989 (*see* SDCL 25–10–26 et seq) and has, since its inception, provided grants to shelters throughout the state serving victims of domestic and sexual abuse and to shelter associations that offer training and technical assistance to shelters. Although the program has previously been funded with special appropriation bills, its longevity establishes it is an ordinary recurring expense of state government. Even if it may have been an extraordinary expense at inception, as stated in *Oster*, 81 S.D. at 456, 136 N.W.2d at 875, "the unusual and extraordinary may become usual and ordinary. *The expanding cost of various health and welfare programs is an example.*" (emphasis added). The respondents assert that the expense is made extraordinary by virtue of the program's grants to non-state programs. Yet, they offer no authority that appropriations for grants to non-state programs are, per se, extraordinary expenses of state government. As this Court stated in *Oster*, "the functions of state government cover a wide range of activities[.]" *Id.* It is not for this Court to determine the wisdom of the activities regularly funded by the legislature. In this regard, "[m]uch must be left to the wisdom, integrity, and good judgment of our legislators." *Id.*

[¶ 30.] Third, the same conclusion can be drawn with regard to the appropriation to the Department of Agriculture, Division

---

6. There is no indication whatsoever that any of these "operating expenses" would include extraordinary expenses such as for new facilities construction.

of Resource Conservation and Forestry. The respondents establish by affidavit that the funds appropriated to the Division will be used in conjunction with local funds to acquire and refurbish surplus motor vehicles and equipment, including excess federal equipment, for distribution to local and rural fire departments for fire suppression purposes. This supports a program that has been in place and ongoing since it was first enacted by the legislature in 1984. *See* SDCL 34–31–6 et seq. Once more, the longevity of the program clearly establishes it as an ordinary and recurring expense of state government.

[¶ 31.] Fourth, as to the appropriation to the Department of Health, Division of Health Systems Development and Regulation, the respondents establish by affidavit that the appropriation will be used in conjunction with available federal funding sources to make grants to improve emergency medical services. The grants will assist local emergency medical service systems in purchasing or upgrading ambulances, emergency medical equipment and emergency communications equipment. This supports a program first enacted by the legislature in 1994. *See* SDCL 1–43–25 et seq. Once again, while this program was initially funded by special appropriation measures, its longevity and recurrence now establish it as an ordinary expense of state government. *See Oster,* 81 S.D. at 450, 136 N.W.2d at 871 ("[i]t is of no great significance that a particular appropriation has never been included in a general appropriation bill in the past as precedent alone does not prove or disprove the existence of legislative power to do so.").

[¶ 32.] In *Oster,* this Court made clear that the reason for the separate bill-two-thirds vote requirement for special appropriations in art. XII, § 2 is the "impossibility of anticipating extraordinary contingen-cies, and the consequent impracticability of fixing in advance an arbitrary and inexorable rule for the limitation and control of taxation necessary to meet them[.]" *Oster,* 81 S.D. at 454, 136 N.W.2d at 874 (quoting *In re Limitation of Taxation,* 3 S.D. at 461, 54 N.W. at 419). As a "guaranty against an unwise or imprudent use of . . . public funds," the Constitution made such extraordinary expenditures subject to the approval and favorable vote of two thirds of the members of each house. *Id.* There is nothing plainly unwise or imprudent about the challenged appropriations outlined above nor are they so exceptional as to render their anticipation, limitation, or control impossible through ordinary means. Thus, they violate none of the dangers foreseen in *Oster* and for which SD Const, art XII, § 2 exists.

[¶ 33.] Based upon the foregoing, the challenged appropriations do not violate article XII, § 2 of the South Dakota Constitution prohibiting special appropriations in the general appropriations bill.

■ [¶ 34.] As an adjunct to their argument on this issue, petitioners strongly urged during oral argument that the challenged appropriations from the Bred Racing Fund and Special Racing Revolving Fund must be special appropriations because it took a two-thirds majority vote of each House of the legislature to create the two special funds in the first instance. Petitioners correctly pointed out that allowing money from the two funds to be reappropriated in the general appropriations bill would allow the legislature to undo by a simple majority vote what it took a two-thirds majority to create. On that basis, petitioners invite this Court to read a two-thirds vote requirement into the Constitution for the amendment or repeal of any special continuing appropria-

tions measure.[7]  This we cannot do.

[¶ 35.]  Our Constitution must be construed by its plain meaning: "If the words and language of the provision are unambiguous, 'the language in the constitution must be applied as it reads.'"  *Cid v. South Dakota Dep't of Social Servs.*, 1999 SD 108, ¶ 10, 598 N.W.2d 887, 890.  Here, the constitutional two-thirds voting requirement for appropriations measures is only imposed on the *passage* of a special appropriation.  *See* SD Const art XII, § 2.  There is no constitutional requirement for a two-thirds vote on the repeal or amendment of an existing special appropriation, not to mention a continuing special appropriation.  Generally:

[s]pecial provisions in the constitution as to the number of votes required for the passage of acts of a particular nature . . . are not extended by construction or inference to include situations not clearly within their terms.  Accordingly, a special provision regulating the number of votes necessary for the passage of bills of a certain character does not apply to the repeal of laws of this character, or to an act which only amends them.

82 CJS *Statutes* § 39 (1999).

[¶ 36.]  It follows that, were the legislature in session, it could meet immediately and, by a mere majority vote of each house, repeal or amend the provisions on the Bred Racing Fund and the Special Racing Revolving Fund.  While this may violate some sense of symmetry, this Court must ever remain mindful that the legislature has plenary authority over appropriations.  As set forth in *Anderson*, 33 S.D. at 579, 146 N.W. at 704:

It must be borne in mind at all times that the full legislative power, including the power to raise public revenues and to appropriate the same to public purposes, is vested solely in the legislative branch of our state government; *that the Legislature, in the exercise of such power, is under no restraint or limitation whatsoever except such as may have been imposed by the people of this state through our state Constitution,* or through some surrender of power to the federal government as evidenced by the federal Constitution; and that *no legislative act should be declared unconstitutional unless the conflict between its provisions and some principle of constitutional law is so plain and palpable as to leave no reasonable doubt of its invalidity.* (emphasis added).[8]

[¶ 37.]  Based upon these principles, we decline petitioners' invitation to read a two-thirds vote requirement into our Constitution for the amendment or repeal of existing continuing appropriations such as the Bred Racing Fund or the Special Racing Revolving Fund.  Creation of such a limitation without any constitutional language to support it would constitute a severe encroachment on a legislative prerogative and would impose a significant burden on the ability of future legislatures to transfer and manage funds for the ordinary operation of state government.  While concerns have been expressed that

---

7.  Petitioners cite no particular authority for such a voting requirement and, for that reason alone, we could deem this argument waived.  *See First Nat. Bank in Sioux Falls v. Drier*, 1998 SD 1, ¶ 20, 574 N.W.2d 597, 601 (failure to cite supporting authority waives an issue before this Court).  Nevertheless, we choose to address it.

8.  Interestingly, this rule was pronounced in *Anderson* in upholding the Legislature's ability to create special continuing appropriations such as the Bred Racing Fund and the Special Racing Revolving Fund; a legislative act not explicitly authorized by the Constitution but upheld on the basis that the Constitution did not prohibit it.

the legislature might transfer money from virtually any special fund to the general fund for any ordinary expense, that has already occurred with this Court's approval. *See e.g. Youngquist, supra* (approving an act of the 1943 legislature reducing the continuing appropriations of eighteen governmental departments by transferring a part of their tax receipts to the general fund where the funds were to be mingled with other tax collections and used to meet appropriations payable out of the general fund).[9] Moreover, it is not difficult to envision future circumstances where budget shortfalls might necessitate the elimination of what some might consider to be nonessential expenditures, to continue funding necessities such as law enforcement and the penal system. A very similar choice was made here. The legislature, in the exercise of its appropriations authority, obviously resolved that it was more prudent to fund the challenged appropriations in the general appropriations bill than to fully fund the prior continuing appropriations for the Bred Racing Fund and the Special Racing Revolving Fund. If even a simple majority of the legislature continued to support those special funds in their entirety and opposed the transfer, they had the option of voting against the general appropriations bill. They chose not to.

[¶ 38.] To paraphrase *Anderson* in the current context, though it may be an unwise policy to permit the legislature to amend or repeal by a majority vote what it has passed by a two-thirds majority, "the remedy must be sought from the legislature itself, or else through such amendments to the fundamental law as will restrict the legislative power." *Anderson*, 33 S.D. at 582, 146 N.W. at 705. We will not insert such a significant limitation into our Constitution under the guise of performing mere interpretation.

### 3. Article III, § 21—Single Subject Requirement

[¶ 39.] SD Const art III, § 21 provides that, "[n]o law shall embrace more than one subject, which shall be expressed in its title."

Article III, § 21 of the South Dakota Constitution has three purposes:

(1) To prevent the combining into one bill of several diverse measures which have no common basis except, perhaps, their separate inability to receive a favorable vote on their own merits;

(2) To prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and,

(3) To fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the Legislature. *We have interpreted Section 21 to contain two requirements: " 'First, that no law shall embrace more than one subject, and second, that the subject shall be expressed in the title.' "* The requirements of this provision are mandatory.

---

**9.** *Youngquist* must be read with care. Much attention has been paid to that portion of *Youngquist* striking down the transfer of certain special highway funds as a violation of a constitutional provision on highway funds that is not at issue here. However, this Court specifically held that, "the invalidity of the provision for transfer of highway funds to the general fund [did] *not* affect the other provi-sions of the act." *Youngquist,* 69 S.D. at 431, 11 N.W.2d at 88 (emphasis added). While this Court did issue a writ of prohibition in *Youngquist,* it was not issued because of any constitutional infirmity in the transfer of funds, but because the Secretary of State failed to honor a referendum petition on the transfer act.

*Barnett,* 1998 SD 84 at ¶ 24, 582 N.W.2d at 393 (emphasis original)(quoting *Accounts Management, Inc. v. Williams,* 484 N.W.2d 297, 302 (S.D.1992)) (citations omitted).

[¶ 40.] Petitioners argue that the challenged appropriations violate article III, § 21 because they change or amend existing law on the permissible use of funds contained in the Bred Racing Fund and the Special Racing Revolving Fund, a matter not within the subject of appropriations. As noted in *Barnett,*

> Such an argument typically goes hand in hand with the argument that a matter of substantive legislation has been improperly included in a general appropriations bill. *See Brown,* 382 So.2d at 663 (rule that appropriations bills shall contain provisions on no other subject a corollary to rule that every law shall embrace but one subject).

*Barnett,* 1998 SD 84 at ¶ 24, 582 N.W.2d at 393, n. 4.

[¶ 41.] The discussion in Part 1 resolves this issue. As we conclude there, the challenged appropriations do not substantively change or amend existing law on the use of funds in the Bred Racing Fund or the Special Racing Revolving Fund. Rather, they transfer funds previously subject to continuing appropriation for those purposes to the general fund and reappropriate those funds. As observed under Part 1, modification of an appropriation is a proper subject in a general appropriations bill. *See Chiles,* 682 So.2d at 76, n. 3 (appropriations bill can, of course, modify an existing law directed at appropriations).

[¶ 42.] In *Oster,* 81 S.D. at 451–52, 136 N.W.2d at 872, this Court determined that the title of the general appropriations bill was adequate to alert the average reader to its singular subject of appropriations notwithstanding the bill's appropriation of money for a variety of purposes. The Court further determined the title of the general appropriations bill need not state with particularity all of the purposes for which it appropriates money and that to do so would cast an "onerous and unnecessary burden" on the legislature. As was explained in full:

> [An appropriations bill's] singular subject is the appropriation of money. It serves no other purpose and its contents are constitutionally defined and limited. Of necessity, *it appropriates money for a variety of purposes all of which need not be stated with particularity in the title. To do so would cast an onerous and unnecessary burden on the legislature.* For these reasons the constitutions of some states expressly exempt their general appropriation bills from the single subject title requirement. Perhaps our constitutional provisions do so by necessary implication, but we need not so decide here as the title to Chapter 277 fully and completely complies with the requirements of Section 21, Art. III. The controlling rule is expressed in the landmark case of *State v. Morgan,* 2 S.D. 32, 48 N.W. 314, as follows:
>
> "The constitutional requirement in our constitution is addressed to the subject. This subject must be single. The provisions of the act must all relate directly to the same subject, have a natural connection, and not be foreign to the subject as stated in the title. The title must state the subject of the act for the information, not only of the legislature, but of the public generally. When the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will or may facilitate the accomplishment of the purpose so stated,

are germane to its title. There is no constitutional restriction as to the scope or magnitude of the single subject of a legislative act."

*Oster*, 81 S.D. at 450–51, 136 N.W.2d at 872 (emphasis added).

[¶ 43.] These same principles are true here. The general appropriations bill was properly captioned as such and, as resolved under Part 1, the challenged appropriations properly fall within the scope of its title. Thus, there is no violation of SD Const art III, § 21.

[¶ 44.] Based upon the foregoing, we hold that petitioners are not entitled to a peremptory writ of prohibition barring the respondents from paying out, disbursing, or allocating funds from the South Dakota Bred Racing Fund and the Special Racing Revolving Fund pursuant to the challenged appropriations in Section 26 of the 2001 general appropriations bill.

[¶ 45.] Writ denied.

[¶ 46.] GILBERTSON, Chief Justice, and KEAN, Circuit Judge, concur.

[¶ 47.] SABERS, and AMUNDSON, Justices, dissent.

[¶ 48.] KEAN, Circuit Judge sitting for MILLER, Retired Chief Justice, who was a member of the Court at the time this action was submitted but was disqualified and did not participate.

SABERS, Justice (dissenting).

[¶ 49.] **The challenged appropriations violate Article XII § 2 of the South Dakota Constitution which prohibits substantive legislation in the general appropriations bill.**

Article XII § 2 of the South Dakota Constitution provides:

The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools. All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature.

[¶ 50.] The funds in question are authorized by SDCL 42–7–71 (S.D. Bred Racing Fund) and by SDCL 42–7–79.1 (Special Racing Revolving Fund). The funds are to "be used by the commission to encourage horse racing and the raising and breeding of horses in South Dakota" (SDCL 42–7–71) and "by the [Racing] commission to increase purses or for operations, or" . . . incidental law enforcement expenses (SDCL 42–7–79).

[¶ 51.] The State argues that the transfers from the South Dakota Bred Racing Fund and the Special Racing Revolving Fund do not violate Article XII § 2 of the South Dakota Constitution. The conference opinion agrees, claiming these transfers are permissible because "the Legislature may transfer money subject to a prior continuing appropriation in a special fund to the general fund and reappropriate that money for new purposes."

[¶ 52.] It is obvious, however, that the challenged general appropriation bill substantively changes the law with respect to (1) the person who will spend the funds, (2) the amount of the funds spent and (3) the purposes for which the funds will be spent. Therefore, it constitutes an appropriation which "shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the Legislature."

[¶ 53.] The cases relied upon neither fully support nor explain the exact basis for the denial of the requested writ of prohibition. For example, in the case of

*State v. Kelly,* this Court held that the attempted appropriation of funds in one bill for separate agencies violated Article XII § 2 that mandates special appropriations "be made by separate bills, each embracing but one object[.]" 65 S.D. 345, 353, 274 N.W. 319, 323 (1937). Specifically, this Court stated:

> The appropriation under consideration is a direct violation of such constitutional provision [SD Const art XII § 2]. A continuing appropriation for the support and maintenance of the Liquor Control Commission and the Department of Justice and Public Safety is not for a single object or purpose. To uphold a special appropriation bill providing funds for separate and distinct departments, institutions, or agencies of the state government is to permit the objectionable practice at which the constitutional provision under consideration is directed. The attempted appropriation is void and of no effect, and the application for a writ of prohibition is therefore granted.

*Id.* In reaching this conclusion, this Court stated that Article XII § 2 was applicable regardless of "whether revenue in the state treasury is derived from general taxation, from license fees, or other sources...." *Id.* This constitutional provision "was designed to safeguard public revenues against hasty and ill-advised legislation[.]" *Id.* Despite the reasoning employed and the result reached in *Kelly,* the grant of the writ of prohibition, the State uses this case as support for the denial of the writ of prohibition.

[¶ 54.] Similarly, the State also relies upon the case of *Duxbury v. Harding,* 490 N.W.2d 740 (S.D.1992). In *Duxbury,* this Court issued a writ of prohibition to prevent the disbursement of certain appropriated funds. The appropriations were held invalid because they had not been the subject of separate bills requiring a two-thirds vote. Again, this case lends credence to the legislators' position, rather than that of the State's.

[¶ 55.] If the State's rationale is followed and such transfers from special to general funds are allowed, there is nothing to prevent the transfer of money from virtually any special fund to the general fund for any ordinary expense. This defeats the safeguard put in place by the South Dakota Constitution, specifically the requirement of a two-thirds vote in both houses for passage of certain appropriations. The purpose of this safeguard is to provide "an adequate guaranty against unwise or imprudent use of public funds,—a rule sufficiently flexible to meet emergencies, yet safe and trustworthy, because resting in the conscience and enlightened judgment of so large a proportion of the people's immediate representatives." *In re Limitation of Taxation,* 3 S.D. 456, 54 N.W. 417, 419 (1893).

AMUNDSON, Justice (dissenting).

[¶ 56.] The legislative record discloses that during the 2001 session, three special appropriations bills were introduced for the transfer of funds and the expenditure of funds. More specifically, Senate Bill 51 providing for the transfer of funds to Social Services was considered on February 16, 2001. The vote was 15 yeas to 19 nays, so it failed, as it did not receive a two-thirds majority. S.J. at 560 (2001). Next, Senate Bill 176, which provided that money from the funds could be transferred for "any other purposes provided by the Legislature," was passed by the Senate on February 16, 2001 with a vote of 20 yeas and 14 nays. S.J. at 559 (2001). On February 27, 2001, however, the Bill failed to obtain a two-thirds majority in the House with a vote of 22 yeas and 48 nays. H.J. at 754 (2001). Finally, House Bill 1285, which provided money to the State Fair,

passed through the House on February 15, 2001, with a vote of 49 yeas to 21 nays. H.J. at 528 (2001). The House, however, refused to adopt extensive amendments made by the Senate, such as transferring money to the general fund, which could have been used for any purpose provided by the Legislature, and reducing the racetrack's disbursement amounts. On March 2, 2001, the House voted not to adopt the Senate amendments with a vote of 66 yeas to 4 nays. H.J. at 842 (2001). The same day the House also voted not to appoint a new committee for this Bill with a vote of 54 yeas to 16 nays. H.J. at 843 (2001). Thus, the third bill at issue also failed to obtain the required two-thirds majority vote.

[¶ 57.] As is evident from the above, these special appropriations did not pass. On the other hand, at the midnight hour they were incorporated into the General Appropriation Act. Notwithstanding the merits of these expenditures, the general appropriation bill should not provide a release valve for the expenditure of public funds in derogation of the constitution. *See* SD Const art XII § 2. Therefore, I authorize Justice Sabers to state that I join his dissent.